# THE STATE v. OLLIE LONG, Appellant.

### In Banc, April 2, 1914.

1. **APPELLATE AND TRIAL PRACTICE: Setting Aside Verdict.** The setting aside of a verdict on the ground that it is against the weight of the evidence is the peculiar function of the trial judge; but appellate courts do not determine the weight of the evidence, and will not set aside a verdict because it seems against the preponderance of the evidence, but it will consider the evidence to the extent of ascertaining whether or not there is any substantial evidence to support the verdict, and if there is not it will set the verdict aside.

2. **SEDUCTION: Promise of Marriage: Corroboration: Circumstances.** In a trial of a defendant for seduction under promise of marriage the evidence of the woman as to such promise must be corroborated, and the corroboration may be by circumstances, but the proof of such circumstances must come from witnesses other than the woman.

3. ———: ———: ———:   **By a Discredited Witness.** Testimony by prosecutrix's father that, three or four weeks after what she testifies was a promise of marriage, he accused defendant of having seduced his daughter, that he at first denied it, but afterwards stated that he did promise to marry her and would keep his promise, is testimony corroborative of her evidence of the promise, and having been believed by the jury and their verdict approved by the trial judge it prevents the Supreme Court from setting aside the verdict on the assignment that there was no corroboration of prosecutrix's evidence of the promise, although the reputation of such father for truth and veracity was demolished by his neighbors, and defendant denied the admission and his denial was corroborated by another witness who heard the conversation between him and the father.

4. **SEDUCTION:**   Prior   Pregnancy:   Physician:   Waiver   of **Statutory Privilege.** The State, on the theory that to disprove pregnancy of prosecutrix in November and December of 1908 tended to prove virtue and chastity on August 22, 1909, the time of the alleged seduction, with the consent of prosecutrix showed a given physicial condition, namely, "womb trouble," by her (the patient). her mother and one of the physicians who treated her in December. She and her mother also testified that the other two physicians who treated her in November pronounced the ailment "womb trouble" and that the third physician treated her for the same trouble. *Held*, that, if there existed a statutory privilege in favor of the State or in favor of the prosecutrix to close the mouth of the two physicians who treated her in November, it was waived by her testimony and by the State's calling forth with her consent the testimony of the physician who treated her in December, and having been once waived it continued waived throughout the trial, and the court erred in refusing to permit the defendant to show by the other two physicians that what the State's witnesses pronounced "womb trouble" was in fact pregnancy. If several physicians treat a patient for the same trouble, and the veil of secrecy is raised as to one of them, by the patient or with her consent, it is waived as to all, whether they treated her at the same time or a month or so apart.

5. ———: ———: ———: ———:   **Material: Rebuttal: Estoppel.** And whether or not such testimony was material, it was prejudicial to defendant, and having been called forth by the State for the purpose of showing that the prosecutrix was a virtuous woman at the time she testifies she was seduced by defendant, he ought to be permitted to rebut it by showing she was pregnant eight or nine months prior thereto. If evidence is harmful and prejudicial, even if not material, it can be

rebutted, and the party introducing it is estopped from object-
ing to rebuttal testimony.

6. ——: ——: ——: ——: **Contradictory of Prosecutrix.**
Where the State by its conduct raises the veil of secrecy from
one physician who treated her and thereby raises the veil from
two others who treated her about the same time for the same
ailment, and prosecutrix testifies that she had never known
any man prior to the time of the alleged seduction, it is error
to refuse to permit the two physicians to testify for defendant
that her ailment was pregnancy.

Appeal from Nodaway Circuit Court.—*Hon. Francis
H. Trimble,* Judge.

REVERSED AND REMANDED.

*John W. Stokes* and *Cook, Cummins & Dawson*
for appellant.

(1)    There was not sufficient corroboration of the
testimony of Carrie Miles, as to the promise of mar-
riage.  R. S. 1909, sec. 5235; State v. Heed, 57 Mo. 254;
State v. Miller, 44 Mo. App. 159.    (2)    The evidence
of Drs. Miller and Davis should have been admitted.
These doctors were not permitted to testify, and the
offered evidence was rejected, on the ground that any
information they might have was acquired under the
confidential relation of physician and patient, and
could not, therefore, because of the statute, be disclosed
by the physician.    (a)    The statute preventing a
physician from disclosing information acquired by him
in his professional capacity, cannot be used by the
State in the prosecution of one of its citizens, so as to
conceal the truth, and thus secure the conviction of the
defendant.    10 Ency of Evidence, 98; 28 Am. & Eng.
Ency. Law, 83; Kling v. Kansas City, 27 Mo. App. 240;
Wigmore on Evidence, sec. 2285; 40 Cyc. 2352.    (b)
The privilege in this case has been waived.    By calling
one of two attending physicians, the privilege of the
statute is waived as to the other.    O'Brien v. Imple-

ment Co., 141 Mo. App. 331; 40 Cyc. 2399; Smart v. Kansas City, 208 Mo. 162; State v. Peterson, 6 Wyo. 419. The privilege of the statute was waived when Carrie Miles, the patient, voluntarily testified as to her relations with the physicians, their examination and treatment of her, and fully disclosed her condition as she says her physicians found it. Highfill v. Railroad, 93 Mo. App. 219; Holloway v. Kansas City, 184 Mo. 43; Lane v. Boicourt, 128 Ind. 420; Webb v. Met. St. Ry., 89 Mo. 610.

*John T. Barker,* Attorney-General, and *Thomas J. Higgs,* Assistant Attorney-General, for the State.

(1) This court, in an opinion in this same case, State v. Long, 238 Mo. 383, held that the testimony of the father of the prosecutrix to the effect that the defendant admitted the promise of marriage was sufficient corroboration. In addition to the testimony of the father of the prosecutrix, John Miles, as to the admission by the defendant of the promise of marriage, there was the direct testimony of the witness, Harry Brunk, to the effect that the defendant had said he had an opportunity to marry, and when asked as to whom he was going to marry the defendant replied "Carrie Miles." The State can rely on the further facts of the attentions paid the prosecutrix and the letters written to her by the defendant, which, in themselves are sufficient corroboration of the promise of marriage. State v. Wheeler, 108 Mo. 658; State v. Eisenhour, 132 Mo. 140; State v. Davis, 141 Mo. 522; State v. Sublett, 191 Mo. 163. (2) The appellant contends that Doctors Miller and Davis would have testified that the prosecutrix was pregnant on November 5, 1908, when the time of the alleged seduction was about the 22nd of August, 1909. There was some other testimony concerning the visit of Doctors Miller and Davis in Novem-

ber, 1908. It is contended by appellant that this testimony and the further fact that Dr. Gray and prosecutrix testified as to treatment given the prosecutrix at St. Joseph, a month later, amounted to a waiver of Sec. 6362, R. S. 1909. The appellant, on this contention of waiver, relies upon the case of Epstein v. Penn Ry. Co., 250 Mo. 1. In this contention the appellant has failed to notice a distinction between the case at bar and the Epstein case. In the Epstein case a Dr. Elston, together with the plaintiff, testified as to the mode of treatment given by Dr. Elston and as to the condition of the plaintiff. A Dr. Christie and a Dr. Phelps were present at the same time and place and the court rejected their testimony as to the same facts. In the case at bar it is proposed to have Doctors Miller and Davis testify to the treatment and condition of the prosecutrix at a different time and place than that testified to by Dr. Gray of St. Joseph, and of which a detailed account was given by both the prosecutrix and Dr. Gray.

GRAVES, J.—Defendant stands charged with the crime of seduction under promise to marry, the information being based on section 4478, Revised Statutes 1909. The scene of the alleged crime is located in Atchison county by such information, and the case was first tried in that county and defendant convicted. [State v. Long, 238 Mo. 383.] The judgment of conviction was reversed and the cause remanded, for reasons fully stated by BLAIR, C., in the cause supra. When the case again reached the circuit court of Atchison county, Judge ELLISON, the judge of that court, disqualified himself, and Judge FRANCIS H. TRIMBLE was called in to try the same. Application was made by defendant for a change of venue, and upon a hearing thereof, Judge TRIMBLE sustained the same and sent the cause to Nodaway county, in which court a trial was had, and defendant again found guilty. By

the verdict his punishment was fixed at six months' imprisonment in the county jail, and a fine of five hundred dollars, and from a judgment upon that verdict the defendant has again appealed to this court. In Division No. 2, an opinion was handed down affirming such judgment, but a motion for a rehearing was filed by the defendant, which motion was sustained, and the cause transferred from that court to this court.

The pertinent facts in abbreviated form are about as follows:

At the date of the alleged offense, the prosecutrix, Carrie Margaret Miles, was practically nineteen years of age and lived on a farm with her parents in Atchison county. The defendant at the same date was about twenty-three years old and lived on a farm, with his parents, in Holt county, but only four miles distant from the farm of Miles. The prosecutrix and the defendant had been acquainted in a casual way for some years prior to August 22, 1909, the date fixed as the time of the seduction. From June to October, 1907, the defendant seemingly paid some attention to the prosecutrix, and during this period visited her upon several Sundays, taking her to church and other public gatherings. During this time the prosecutrix claims no ungentlemanly conduct upon the part of the defendant. She says, however, that twice he proposed marriage, and twice she rejected him. That she told him her folks said she was too young to marry, and that they agreed to quit company for awhile, but with a tacit understanding that his attentions would be renewed later. These things the defendant denies. In October, 1907, defendant's attentions to prosecutrix ceased, and each went his or her own way for the months between that date and a short time before the date of the alleged offense. During these months, October, 1907, to August, 1909, nothing passed between the parties, except several unimportant post cards sent by the defendant. They met occasionally at public

places and talked upon commonplace subjects. Prosecutrix during this time kept company with other young men and corresponded with them,—among them a Mr. Lee and also a young man who lived at their home. August 15, 1909, defendant, his two sisters and a young man named Miles, were at church and were invited by Carrie Miles to her home for dinner. The invitation was accepted, and later in the day (about five or six o'clock in the evening) they all went over to the defendant's home. Carrie Miles was escorted over there by Mr. Lee, who had called up by phone and engaged her company whilst defendant and the others mentioned were there. Young Lee took her home from Long's place. Up to this point there was nothing wrong between these two parties. Miss Miles says that on the 15th of August defendant engaged her company for the next Sunday, August 22nd. Defendant says that she asked him over to take her to church, and he told her he didn't know about it, but would write. The record shows he did write telling her he would be over to take her to church, and he went over according to the terms of the letter. He drove her to church, a distance of five miles, without incident worthy of relation. After the services the two, in the buggy, started for her home. The church was in Holt county, and the county line was much nearer her home than the church. She says that about the time they reached the county line between Atchison and Holt counties (her home being in Atchison) he rather fervently proposed marriage to her, and though not exactly at first, but she shortly consented. Immediately following he proposed illicit intercourse, and with but little hesitation (speaking from the record) to this she consented. True it is, she says that he promised to marry her the next Wednesday, and urged that no harm could come of the intercourse.

According to the story of prosecutrix she prepared to go to town with him Wednesday to get married, but

defendant, although duly waited for, came not. The whole transaction of becoming engaged, and having intercourse covered a very short time. Counsel for defendant figure it out to be thirty seconds. The parents were not advised of the proposed marriage on the Wednesday named. Nor did the prosecutrix take any steps to find out why defendant had not kept his word. She says that they had agreed to keep the marriage matter a secret until he could rent a certain farm in the neighborhood. She says that defendant came back the next Sunday August 29th, but this is denied by defendant, he says that he was not there again until September 5th. According to the prosecutrix he came to her home on Sunday, August 29th, and took her to church; that he explained his failure to keep the marriage date, by saying that he had not rented the farm as yet. She says that on the trip home from church the promise of marriage was again renewed, and intercourse followed the renewed promise, with a little more alacrity than upon the previous occasion. The next Wednesday was fixed for the marriage, but she again waited in vain for defendant. At no time were the parents advised of any promise to marry, until September 9th, when the mother (on a wash day) made discoveries to the effect that all was not well with the girl, and asked her to explain, and then she told of the alleged marriage engagement and the intercourse. Prosecutrix made no effort to find out why defendant had for a second time made default, but on September 12th, three days after her disclosure to her parents,  she did write the following rather informal letter:

Fairfax, Mo., September 12, 1909.

Dear Friend: I will take the pleasure of writing to you this evening. How have you been getting along these days. Olive what fine time did you have at fairfax Thursday. We went up Friday, but thought it was dull. Olive, can you come and take me to Craig one day, wed. or thurs. Papa is going for cattle and the boy's in going to school and Harry is going

to take his company. So that way, I wont have any way to go. Olive, let me know over the phone if you can come and take me. Let me know as soon as you get this.

I remain, as ever,

Carrie Miles.

No answer came to this letter. September 16th, Miss Miles and her father and mother attended a re-union at Craig, and defendant and his sister were there. The father testified that he, in the town of Craig, accused the defendant of having seduced his daughter, and that the defendant at first denied it, but afterwards stated, that he did promise to marry her, and would keep his promise. Defendant denied such an admission, and his denial was also corroborated by another witness, who says he heard the conversation between John Miles, the father, and the defendant. The reputation of Miles for truth and veracity was literally demolished by his neighbors, and no effort was made to patch up the torn garment of reputation after the defense was through with it.

With one exception this sufficiently outlines the case for a discussion of the points urged for reversal. Upon the matter left out at the present, we will detail the facts fully in connection with the point.

I. Speaking personally the merits of the State's case does not impress me. A thorough reading of this voluminous record has left a "tang" some what averse to my judicial "taste," if I may be pardoned for the use of such expressions. But in cases of this kind the trial judge has the peculiar function of setting aside a verdict, when he is impressed with the idea that such verdict is against the weight of substantial evidence in the case. As has often been said by this court this function is one peculiarly belonging to the trial judge, and appellate courts do not usually interfere with this peculiar judicial discretion, lodged

**Appellate and Trial Practice: Weight of Evidence.**

by the law, with trial judges.  We will, however say
whether or not there is substantial evidence to sustain
the verdict, but will not pass upon the weight of the
evidence.  In other words, this court will not disturb
a verdict because against the apparent weight of the
evidence, because the law has imposed the duty to
grant new trials for that ground on the trial judges.

It is urged in this case that there is no sufficient
corroboration of the prosecutrix's story as to the
promise to marry.  If there is no corrob-
oration, it is our duty to say so.  Further,
if the corroboration does not meet the re-
quirements of the statute, it is our duty
to say so.  But on the other hand if there is corroborat-
ing evidence, which if believed, meets the requirements
of the statute, and this corroborating evidence is re-
butted by a greater weight of evidence contra, then
the peculiar functions of the trial court is called into
play, and such court should assume the full measure
of responsibility.  The statute (R. S. 1909, sec. 5235)
reads:

*Seduction: Corroboration of Promise of Marriage.*

"In trials for seduction under the promise of
marriage, the evidence of the woman as to such prom-
ise must be corroborated to the same extent required
of the principal witness in perjury."

The corroborating evidence required by this stat-
ute may be by circumstances, but the proof of these cir-
cumstances must come from witnesses, other than the
woman.  [State v. McCaskey, 104 Mo. l. c. 646-7.]  In
the McCaskey case it is said:

"The State stood on the uncorroborated evidence
of the prosecuting witness in this case.  She testified
defendant promised to marry her, and under and by
virtue of that promise seduced her.  Section 1912, Re-
vised Statutes 1879, provides that "in trials for seduc-
tion under promise of marriage, the evidence of the
woman, as to such promise, must be corroborated to
the same extent required of the principal witness in

perjury.' It has been held by this court that 'evidence of circumstances which usually accompany the marriage engagement will satisfy the statute as to supporting evidence.' [State v. Hill, 91 Mo. 423.]

"Here the prosecuting witness testified to the promise and also to 'the circumstances attending the marriage engagement,' and the State argues that that satisfies the statute. It is the evidence of the woman as to the promise of marriage that must be corroborated. There must be some evidence independent of the principal witness as to the promise of marriage. In this case there is an attempt to evade this plain statutory provision by the principal witness testifying first to the promise of marriage and then to 'the circumstances' that corroborate her. This is clearly not the law. She must be corroborated by some witness other than herself. [State v. Hill, supra; Ros. Crim. Ev. (6 Am. Ed.) 765; State v. Reeves, 97 Mo. 668; State v. Primm, 98 Mo. 368.]''

Upon the question of corroborative proof, when the case was here before, 238 Mo. l. c. 393, the court correctly said:

"No circumstances indicative of an engagement were proved. It is true there is evidence that about two years prior to the time prosecutrix testifies her downfall was accomplished, defendant called on her several times, and prosecutrix testifies that these attentions culminated in October, 1907, in a proposal of marriage which she did not accept, and no further attentions seem to have been paid her by defendant until August, 1909. In the interim she attended church with other young men and corresponded with them. Defendant renewed his suit, according to prosecutrix, on August 22, 1909, and on the evening of that day the proposal of marriage was made and accepted and the betrayal almost immediately followed. This is prosecutrix's version of the matter. Her mother had no

knowledge of any engagement of marriage until about September 13, 1909, when certain explanations demanded by her of prosecutrix elicited the accusation against defendant.

"Defendant was seen in public with prosecutrix in 1909 as her escort but twice, once on August 22, and again either on August 29 or September 5.

"Four or five postcards were offered by the State but were of such character that they are of little value for any purpose, and all were dated prior to August 22, 1909, when the promise of marriage is said to have been made.

"These circumstances are not sufficient to meet the requirements of the statute (Sec. 5235, R. S. 1909) as to the corroboration of the prosecutrix as to the promise of marriage (State v. Hill, 91 Mo. l. c. 426; State v. Eisenhour, 132 Mo. l. c. 147; State v. Davis, 141 Mo. l. c. 525), and the instruction on this phase of the case should not have been so worded as to indicate to the jury that, without more, they might afford a basis for a finding that prosecutrix was sufficiently corroborated as to that promise."

As to the matters and things above discussed the record now is about as it was then. There is no corroborative evidence except what is given by a witness Brunk, and the father, John Miles. John Miles testifies to an admission made by the defendant in the town of Craig on September 16th. But as indicated in the statement his reputation for truth and veracity is thoroughly "riddled" by his neighbors, and the State brought none to the rescue. Not only so, but defendant denies any such admission, and in this he is corroborated by a witness who heard the talk at Craig between John Miles and defendant.

The witness Brunk appears upon the scene for the first time in the second trial. He was living at the time in the State of Nebraska, but claims to have been back home on a visit. He says that he met de-

fendant in Craig and had a conversation with him. The record had best speak for him. It reads:

"Q. Tell the jury what he said about his marrying Carrie Miles, if he said anything about it? A. I came down by the Racket at Craig and Ollie and I met there—I always chat with the boys that I meet—I said, 'Ollie, you ain't married yet, are you Ollie?' He says, 'No, but I have an opportunity to get married.' I said, 'Who to?' He said, 'Carrie Miles.' "

Upon cross-examination the witness firmly fixed this conversation in the year 1908, at which time no one claims there was a promise of marriage. So that this evidence lends but little aid, if any, to the State's case. It should be added here that the defendant testified that he had never seen the witness Brunk in his life until the day he testified. With the evidence of Brunk to one side, the only corroborative evidence is the testimony of John Miles that the defendant admitted to him the promise of marriage at Craig, Missouri, on September 16th. If Miles spoke the truth, the prosecutrix was corroborated. If he did not, she was not. The credibility of his testimony was with the jury and the trial court. If the trial court was convinced of the false testimony of this witness the verdict should have been promptly set aside. The matter of his credibility, therefore, reaches this court vouched for by the verdict of the jury and the action of the trial court on such verdict. We therefore say, as was in effect said when the case was here before, the credibility of this witness was with the jury and the trial court. With truth stamped upon the face of that testimony by the action of the jury and the trial court, we can not say there was not the corroborative evidence required by the statute. What we might have done, if trying the case *nisi*, is immaterial. The question here is, was there corroborative evidence of the promise to marry, with the word "truth" written across the face of John Miles's testimony by the trial

jury and the trial court. We say by the trial court as well as the jury, because, if that court was convinced of the falsity of John Miles's testimony, it had but one plain duty in the premises. Under the facts, we feel constrained to rule this contention against the defendant.

II. We reach now a vital question in the case, and one which calls for a little fuller detail of the facts.

Seduction: Evidence of Former Pregnancy.

Carrie Miles blossomed into womanhood when she was between twelve and thirteen years of age. From the beginning she was troubled at the menstrual periods. She had to have a physician at these times. She often fainted away and had spells or fits at these times. By her folks her trouble was assigned to be "womb trouble." Dr. Davis had been the family physician for several years. The prosecutrix and her mother testify that about November 5th plaintiff was suffering from this "womb trouble" and that Dr. Davis was called to treat her. That her condition was such that Dr. Miller was sent for to hold a consultation with Dr. Davis. That the two doctors consulted over her situation and prescribed for her. They say the doctors said she was suffering from this old "womb trouble." The evidence then discloses that she continued to feel badly until the father and mother took her to St. Joseph on December 2nd following, when she was operated upon by one Dr. Gray. Dr. Gray had formerly lived at Craig and had been the family physician of the Miles family. When the case was reversed and remanded by this court and went back for a new trial (the trial now under review) the State for reasons best known to its officers took a new turn in the case. Evidently there were whisperings that all had not been well with Carrie Miles, when Dr. Gray operated upon her December 3, 1908. In this trial the State proved the good repute (previous to this trouble) of Carrie Miles by her

general reputation in the neighborhood. This general reputation for virtue and chastity was shown by the neighbors. But the State did not stop here. It put on Dr. Gray, who it was claimed treated her for this same "womb trouble" from which she was suffering when Drs. Davis and Miller treated her, and proved by him that she was not suffering from pregnancy at that time (December 3, 1908). Not only so, but that there was no evidence of her having ever been pregnant before that time. In this situation, the defendant put on the stand both Dr. Davis and Dr. Miller, and offered to prove by them that Carrie Miles was pregnant in November, 1908, at the time they treated her for what she and her parents called the "womb trouble." Upon the objection of the State—not Carrie Miles— the court excluded this proffered evidence. In this the defendant charges error. It is apparent from this record that all three doctors—Drs. Davis and Miller in November and Dr. Gray, December 2nd, following—were called upon to treat and did treat the same malady, whatever it, in fact, was. This not only appears from the testimony of the girl, but from the father and mother as well. It is also clear that the girl and the mother undertook to say not only for what she was being treated, but they aver that Drs. Davis and Miller so stated the nature of the girl's trouble. Under this state of the record counsel for the defendant suggest several questions, and these we take next.

III. At the outset defendant says that the statutory privilege under which the testimony was excluded does not exist in this case. The position is that this being a State case, the State can not exclude from the jury any evidence which shows the truth of the case and thereby the innocence of the defendant. If the views we entertain of this case, and which we will explain

**Seduction: Prosecutrix's Prior Pregnancy: Statutory Privilege: Testimony of Her Physicians.**

later are correct, we will not follow counsel in their argument upon this question, but leave it to a case where such question is the real and only turning point. We think there are other points in this case which necessitate a reversal of the judgment, and if reversed for the reason we have in mind, the particular question here urged will not be a controlling one upon a further trial of the cause, if such further trial be had. With these remarks, we pass the question.

IV. We think the question of privilege, if there was such a question in the case, was waived by the State and the prosecutrix. We must not lose sight of the facts. The State was attempting to show the physical condition of the prosecutrix in November and December of the year 1908. The State, with the consent of the prosecutrix, opened the sick chamber, and showed a given physical condition, i. e. "womb trouble," not pregnancy. This the State did by the patient, her mother, and one of the three physicians, who treated her for that alleged trouble. The State—not the patient—now seeks to close the mouth of the other two physicians. Can it be done? We think not. The State proceeds upon the theory that to disprove pregnancy in the fall of 1908 tended to prove virtue and chastity in August, 1909. By that theory it ought to be bound, a question, however, we discuss next. Getting back to the question of the waiver of the privilege. At common law there was no privilege as to communication between physician and patient. [40 Cyc. 2381, and cases cited.] But this rule is changed by statute in this State. [R. S. 1909, sec. 6362.] Communications between patient and physician are privileged in Missouri. But that fact does not mean that there can be a waiver of the privilege, and if it is once waived, it remains waived until the determination of the case, it matters not how many trials may be required. [El-

*Waiver: Statutory Privilege.*

liott v. Kansas City, 198 Mo. 593.] Because the waiver, if made, stood throughout the case, we were admonished to make the pronouncement we did in the previous paragraph, i. e., that the question there propounded would not be a vital question upon a retrial of this case. The prosecutrix and the State waived the privilege as to Drs. Davis and Miller when it was shown by the prosecutrix and her mother that these physicians treated her for the old malady, i. e., "womb trouble." The girl says that she took the medicine of Dr. Davis, and that the two doctors consulted over her case. She goes further and puts in the mouth of the doctor the name of her malady. She and the mother, present at the time, had given to the world all the secrets (so far as they claim these were secrets) of that sick chamber. That she was taken to St. Joseph for treatment of the same alleged trouble by Dr. Gray in less than a month, is shown by the prosecutrix, her mother and Dr. Gray. It must not be overlooked that all three of these doctors were claimed to have treated the identical trouble, i. e. "womb trouble," to use the vernacular of the girl, her mother and her father, rather than the technique of Dr. Gray. With three doctors treating the patient for the same alleged trouble, malady or injury, the State picks out one, evidently most favorable to it, and shows what the trouble was. Yes, it is described in the most minute details, and all to the benefit of the State. But when the defendant says "You have raised the veil of secrecy and published what you say are the facts about the girl's trouble, I want to show by the other two doctors what the real facts are," the State and the court say no. This was error.

In Smart v. Kansas City, 208 Mo. l. c. 207, it is said by LAMM, J., in which the writer concurred, that the time was ripe to take an advanced step in the construction of our statute of privilege, and upon the question of waiver of such statutory right. I do not

believe that the doctrine we then announced was an advanced step in the law. I think the courts had long before taken the very step, being impelled thereto by plain legal principles. LAMM, J., thus said:

"I am, furthermore, of the opinion that when Miss Smart tendered to the jury the issue as to the condition of her knee both before and after the injury (which she did) and when she withdrew the veil of professional secrecy by introducing as a witness one out of a number of physicians who had examined her knee, and by his testimony made public the result of his investigation as to its condition, she waived her privilege of privacy and confidence as to any of her other physicians in relation to the same subject-matter. A litigant should not be allowed to pick and choose in binding and loosing—he may bind or he may loose. It he binds, well and good; but if he looses as to one of his physicians, the seal of secrecy is gone—the spell of its charm is broken as to all. May one cry secrecy! secrecy! professional confidence! when there is no secrecy and no professional confidence? As well cry, Peace, peace, when there is no peace. [Jeremiah 6:14, q. v.] To hold so leaves a travesty on justice at the whimsical beck and call of a litigant. He may choose a serviceable and mellow one out of a number of physicians to fasten liability upon the defendant, and then, presto! change! exclude the testimony of those not so mellow and serviceable, to whom he has voluntarily given the same information and the same means of getting at a conclusion on the matter already uncovered, by professional testimony to the jury. There is no reason in such condition of things, and where reason ends the law ends. The right to secrecy in confidential and professional matters may be likened unto salt. But what if the salt has lost its savor, wherewith may aught be salted? To my mind the time has come for us to take a step in advance and to construe the statute

to mean that when a litigant breaks the seal of professional confidence and secrecy and waives it as to A., then by the same token it is broken and waived as to B., C. and D. who bore the same relation to him as did A.''

The very recent case of Epstein v. Pennsylvania Railway Co., 250 Mo. 1, is fully as broad, if not broader, than the views above expressed. In this case Judge ·FARIS reviews the case law upon the question of waiving the statutory privilege, and it will be noted that much of it antedates what was said in the concurring opinion in the Smart case, supra.

In the case at bar, the State, with the consent of the prosecutrix, was attempting to establish the physical condition of the prosecutrix in November and December of 1908, because such condition, it was thought, tended to enhance the interests of the State. For this purpose the State, with the consent of the prosecutrix, takes one of the three physicians who had treated her for the alleged physical ailment, whatever it might have been. In this the State is much like a plaintiff in a personal injury suit, when the plaintiff attempts to prove the character of the injuries by one of the many physicians whom she may have had attending her. We can see no difference in the rule which should be applied in these two instances. The question is, can the party give to the world the secrets of the sick room through her chosen physician, selected for that purpose, and yet claim the privilege as to all of the other physicians whom she has had treat the same injury or trouble. In the case at bar the real secret of the sick room was the malady or trouble from which the prosecutrix was suffering. This trouble she herself undertook to publish to the world—whether truthfully or not is another matter. Not only so, but she consented to one of the attending physicians likewise publishing this condition of hers. And if the several physicians treat for the *same* trouble (as is the case here) then 'it can

make no difference that their treatment was at different dates. The question of waiver was fully settled by this court long before the Smart case, supra. In Elliott v. Kansas City, 198 Mo. l. c. 607, it is said:

"Upon this proposition the expressions by the courts having the question in judgment before them is almost uniform that the purpose sought by the prohibition contained in the statute against disclosing professional information, is for the purpose of allowing greater freedom between physician and patient, and was enacted as a matter of public policy to confer upon persons seeking the service of a physician a personal privilege, and closing the door to the sick room and of preventing his publishing to the world their infirmities. That this personal privilege may be waived all the authorities agree. It is equally well settled, as was said in Fox v. Turnpike. Co., 59 N. Y. App. Div. l. c. 369, that 'when a patient voluntarily opens the door of the consultation room and gives a view that may have been specially arranged for the purpose, it would not be in accordance with the spirit of the statute or the interest of truth to shut the door against a view to be described by the physician.' In Morris v. Railroad, 148 N. Y. l. c. 92, 93, the proposition involved in this proceeding was in judgment before that court. The principle was announced in that case that a plaintiff could not sever her privilege, waiving it in part and retaining it in part. It was there expressly ruled that 'when she waived it, it ceased to exist, not partly but entirely . . . Having once consented to and acquiesced in the complete uncovering and making public what before was private and confidential, the seal of confidence is removed entirely and the waiver cannot be recalled . . . The information is open to the public and the patient is no longer privileged to forbid its repetition. A waiver once made is general and not special, and its effect cannot be properly limited to a particular purpose or a particular

person  . . .  After the information has once been made public no further injury can be inflicted upon such rights and interests of the patient as the statute was intended to protect, by its repetition at another time or by another person.'

"In McKinney v. Railroad, 104 N. Y. 352, the reasons for the application of the doctrine of waiver of a personal privilege were very clearly announced. The court in discussing the proposition used this language: 'It is claimed by the appellant that the ban of secrecy having once been removed by the patient, and the information having lawfully been made public, the right to object further thereto has not been conferred. There seems much reason in this claim. The patient cannot use this privilege both as a sword and a shield, to waive when it inures to her advantage, and wield when it does not. After its publication no further injury can be inflicted upon the rights and interests, which the statute was intended to protect, and there is no further reason for its enforcement. The nature of the information is of such a character that when once divulged in legal proceedings, it cannot be again hidden or concealed. It is then open to the consideration of the entire public, and the privilege of forbidding its repetition is not conferred by the statute. The consent having been once given and acted upon cannot be recalled, and the patient can never be restored to the condition which the statute, from motives of public policy, has sought to protect. The stringency with which the rule excluding privileged communications is applied by this court is illustrated in the recent case of Renihan v. Dennin, 103 N. Y. 573, but there is no principle of authority for holding, after a consent to publish such information has been properly given, and the evil, if any, consummated, that the privileged person can again raise the objection. The object of the statute having been voluntarily defeated by the party for

whose benefit it was enacted, there can be no reason for its continued enforcement in such case.' ''

Later in the same case it is further said:

"There is some conflict in the adjudications upon this proposition but the greater weight of authority is in harmony with the principle announced in the authorities heretofore cited. We shall not undertake to reconcile such conflict. *In our opinion the principle applicable to this proposition, as announced in the New York case, is sound, and the reasons assigned for the announcement of the doctrine are equally so.* It is insisted by learned counsel for respondent that this principle is not applicable to the case at bar, for the reason that in the former trials the plaintiff did not introduce the physician, and therefore this rule is inapplicable. It is sufficient to say of that contention that the purpose of judicial investigation is and should be to ascertain the truth surrounding the transaction to be judicially determined, *and we are unable to make any distinction as to the application of the doctrine of waiver, where the patient herself opens the door to the sick room, and where she consents and acquiesces in someone else opening such doors. In principle there is no difference.*''

The italics are ours. To like effect in O'Brien v. Implement Mfg. Co., 141 Mo. App. l. c. 337, the Kansas City Court of Appeals, said:

"The question is raised as to the ruling of the court in excluding Dr. Hassig as a witness to prove the condition of the plaintiff's injuries. Having introduced one of his physicians to prove the condition of his injuries the plaintiff waived the privilege of the statute. It is universally held that this being a personal privilege may be waived. In Elliott v. Kansas City, 198 Mo. 593, the court in passing upon the question, held that where the privilege of the statute has once been waived it could not be withdrawn. Plaintiff's assumption is that notwithstanding the privilege

was withdrawn by the introduction of one of his physicians it was not waived as to the other. His position is not tenable. In the above case the court quotes with approval the holding in Morris v. Railroad, 148 N. Y. l. c. 92, 93. It is there held that when the privilege was once waived it ceased to exist. It is there said: 'When a waiver is once made it is general and not special, and its effect cannot properly be limited to a particular purpose or a particular person. After the information had once been made public no further injury can be inflicted upon such rights and interests of the patient as the statute was intended to protect, by its repetition at another time or by another person.' "

The Epstein case, supra, is so recent that a mention of the rule therein announced is sufficient. We concede the statute of privilege to be a wise one, but it should never be so construed as to make it both a shield and a dagger at one and the same time. If the patient is suffering from a malady the physician should not be allowed to first bring to light that affliction of the patient. The very purpose of the statute is to hide, as with a veil, the malady and trouble for which the physician treated her, and what may have passed between them in the confidential relationship of physician and patient. But when the veil has been lifted by the patient or with her consent, and the secrets of the sick chamber given to the world, what logic is there in saying that the patient can clog the wheels of justice itself, by closing the mouth of other physicians, who know the real facts. In other words, if the patient raises, or permits to be raised, the veil of secrecy with lying lips as to what the conditions were, should this waiver of secrecy still leave to her the power of suppressing the truth, by objecting to other physicians who about the same time treated her for the same identical alleged trouble? We think not. In other words if a patient is suffering from a given malady, and is

treated by several physicians near the same time, for the said same trouble or malady, then if she and one of her physicians with her consent, make public the character of her trouble, she has waived the right to, longer keep the exact character of that trouble further secret, and the other physicians are competent to testify as to what this malady or trouble was in reality. Any other rule would be but to permit a patient in a court of justice to play both fast and loose. Any other rule would permit the patient to "choose a serviceble and mellow one out of a number of physicians" as said LAMM, J., in Smart v. Kansas City, supra. We (LAMM, J., and the writer hereof through him) said then that we should "construe the statute to mean that when a litigant breaks the seal of professional confidence and secrecy and waives it as to A, then by the same token it is broken and waived as to B, C, and D, who bore the same relation to him as did A." To my mind that is the correct doctrine. To illustrate, if the patient is injured in a railway wreck, and calls several doctors in the course of a reasonable time, to treat him for such injuries, changing at times from one to another, but all treating him for the selfsame trouble, then if the patient breaks the secrecy by permitting one to testify as to the character of his injury, it is broken as to all. Any other construction of the doctrine of waiver (a doctrine thoroughly recognized in this State) would permit the patient to continue to employ doctors until he got one to his choosing, and when he did so, could make him the sole agent to make public the secret of the sick room. Such a course would be an abhorrent fraud upon the courts and one for which they should not stand. Justice should not be trifled with in any such manner. And we repeat that, in the case at bar, the patient had some kind of a physical ailment (one side says "womb trouble"—the other pregnancy), but whatever it was, she had three physicians to treat her for it in the course of less than

a month, and she herself and one of the physicians makes public what they say this trouble was, and not only this, but she goes further and says to the jury that Drs. Davis and Miller said that it was "womb trouble," just as she and Dr. Gray testified, and I say in such case, Drs. Davis and Miller are competent witnesses, because the secrecy secured by the statute has been waived. The trial court erred in excluding these two witnesses. They should be permitted to testify upon the next trial, because a waiver once made can not be recalled. It remains until the final termination of the case.

V. But it is said that this evidence as to the prosecutrix not being pregnant in November and December, 1908, was immaterial, although offered by the State, and for that reason the defendant should not be permitted to rebut such testimony by these two tendered witnesses. There are several sufficient answers to this contention of the State. In the first place it is true that the State did not have to introduce this particular evidence, for it could have relied upon the general reputation of the prosecutrix, as theretofore shown. It is also true that as a general rule immaterial evidence can not be rebutted. But all this does not reach the point in this case. The State introduced this evidence upon the idea that it would strengthen the position of the State upon the question of the girl being chaste and of good repute—theretofore and at the time of the alleged offense. The time fixed by the State was less than nine months of the date of the alleged offense, leaving rather short period for reformation, if as a fact she was pregnant. The State introduced this prejudicial matter of its own volition upon the theory that it was competent and material, and should now be estopped from declaring it immaterial. In other words, the State should not be permitted to

*Immaterial, but Prejudicial: Rebuttal: Estoppel.*

get an undue advantage of the defendant in such a manner. But aside from that, even if it be conceded that the evidence was immaterial, yet if such character of evidence is harmful and prejudicial, it can be rebutted, and the party introducing it is estopped from objecting to the rebuttal evidence.

Thus in 30 Am. & Eng. Ency. Law (2 Ed.), p. 1103, it is said: "A party who draws from his own witness irrelevant testimony prejudicial to the opposing party ought not to be heard to object to its contradiction or impeachment on the ground of irrelevancy."

So too in Sisler v. Shaffer, 43 W. Va. l. c. 770, the Supreme Court of West Virginia said: "His own evidence on the point was irrelevant, but having introduced it in support of his evidence, the plaintiff had the right to contradict it. 'A party who draws from his own witness irrelevant testimony, which is prejudicial to the opposing party, ought not to be heard to object to its contradiction on the ground of its irrelevancy.' [State v. Sargent, 32 Me. 429.] Strange cattle having wandered through a gap made by himself, he cannot complain."

In Grimes v. Hill, 15 Colo. l. c. 365, it is said: "The defendant, having introduced the testimony concerning the conversation with Williams in support of his side of the issue, was not privileged to deny the materiality of such testimony for the purpose of preventing its contradiction."

So we say in this case: The State having introduced this testimony of the prosecutrix and Dr. Gray, on the theory that it helped the State's case, had no right to deny the materiality of the evidence to prevent its contradiction by the other two doctors.

VI. There is another matter which might be suggested. If the State by its conduct, with the consent of the prosecutrix, had raised the veil of that secrecy

Contradictory of
Prosecutrix:
Virtue:
Testimony of
Physician.

imposed by the statute, and these two doctors became competent witnesses in the case, then the refusal of their testimony was absolute error, for the reason that the girl had testified that she had never known any man before this defendant. This evidence of pregnancy would contradict that statement of the prosecutrix. Not only so, but the defendant had the right to show that she had been intimate with other men in 1908, as bearing upon the question of her chaste character in August, 1909. [State v. Patterson, 88 Mo. 88; State v. Wheeler, 94 Mo. 252; State v. Sharp, 132 Mo. l. c. 173.] These opinions express the law of this State. State v. Dent, 170 Mo. 398, and State v. Fogg, 206 Mo. 696, do not contravene the doctrine of the Patterson case, supra. This court can not say as a matter of law that if a woman has been unchaste in 1908, she has reformed by August 22, 1909. Such question is one for the jury upon all the facts. In the Sharp case, supra, the trial court so amended an instruction as to let the jury pass upon the question of reformation, and we approved that action.

Upon the whole, the judgment of conviction in this case should be reversed and the cause remanded. It is so ordered. All concur. *Woodson and Walker, JJ.,* in separate opinion by *Woodson, J.*

### . CONCURRING OPINION.

WOODSON, J.—I concur in the result reached in this case, not because I believe my learned associates have correctly construed the statutes of confidential communications, but for the sole reason that the majority of the court have decided the matter so often against my views of the statutes, that I can see no useful purpose to be achieved by my continual dissent.

But as a final suggestion I wish to ask my associates the same question that I propounded in the Epstein case, 250 Mo. 1, l. c. 41. Where is the case to which the statutes could *possibly apply,* if the construction placed upon them by the court, in this and the Epstein case, is a correct construction thereof?

The answer here will be as it was there——.

*Walker, J.,* concurs.