## LEONARD SMITH v. STATE.

No. A-7012. Opinion Filed Oct. 11, 1930.
Rehearing Denied Dec. 13, 1930.
(293 Pac. 569.)

340

R. D. Miller, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

CHAPPELL, J.   The evidence of the state was that the defendant and his wife attended a dance at the home of Mrs. Freeney, in the city of Hollis; that among those present was Russell Breedlove, the deceased; that the defendant had been married about a month and that he was jealous of the attentions of other men towards his wife, and that such jealousy was the cause of the difficulty which resulted in the killing of Breedlove; that the defendant objected to Breedlove dancing with his wife, being angered at what he claimed were improper attentions on the part of Breedlove toward defendant's wife; that defendant stopped Breedlove and his wife from dancing; that defendant was standing in one corner of the room cleaning his finger nails with his knife; that defendant caught deceased by the shoulder and told him he objected to him dancing with his wife, and that the defendant pushed the deceased toward the door and said, "Get out and we will settle it."   That immediately after defendant and deceased got outside of the door they started fighting, and that defendant stabbed deceased a number of times with his knife, from the effects of which deceased died two days later.

The defense relied upon was self-defense, defendant contending that Breedlove, the deceased, got him to go out of the house, and that he only went out with the deceased for the purpose of talking to him and trying to persuade him to leave his wife alone; that deceased had been drinking and assaulted the defendant, and that everything the defendant did was done in self-defense and without fault on his part.

Defendant first contends that the court erred in giving instruction No. 12 over the objection and exception of the defendant, which instruction reads as follows: "Whenever a person voluntarily enters into a conflict, or mutually agrees with his adversary to engage in a voluntary conflict and enters therein after such mutual agreement, such person thereby waives his right of self-defense, and no matter how hard pressed he may find himself during the engagement, if he kills his adversary, he is guilty of manslaughter in the first degree and a plea of self-defense will not avail him." Defendant contends that the giving of this instruction was erroneous, first, because there was no evidence to authorize the giving of said instruction. It is a sufficient answer to this objection to say that the evidence of the state shows that the defendant accosted deceased on the dance floor, protested against his dancing with his wife and shoved him towards the door telling him they would settle the difficulty outside.

The law is well settled that one who seeks and brings on an affray cannot shield himself under a plea of self-defense. Reed v. State, 2 Okla. Cr. 589, 103 Pac. 1042; Rollen v. State, 7 Okla. Cr. 673, 125 Pac. 1087; Young v. State, 11 Okla. Cr. 22, 141 Pac. 285; Berry v. State, 23 Okla. Cr. 223, 213 Pac. 909; Graham v. State, 25 Okla. Cr. 372, 220 Pac. 967.

It is also well settled that, where the defendant seeks or provokes a difficulty without any intention of killing or doing serious bodily injury to the deceased, and a combat ensues, and, the defendant, being hard pressed, kills the deceased, then the defendant will be guilty of manslaughter, unless before the fatal blow was struck, or shot was fired, the defendant in good faith sought to withdraw from the combat. Koozer v. State, 7 Okla. Cr. 336, 123 Pac. 554; Moutry v. State, 9 Okla. Cr. 623, 132 Pac. 915; Odum v. State, 21 Okla. Cr. 87, 204 Pac. 1118.

Under the evidence in the case it would make no difference if, after the deceased and the defendant had gone out of doors, the deceased assaulted the defendant, for the reason that defendant put himself in fault in going out of doors, when he must have known that deceased had no other purpose in getting out of doors except to settle the difficulty with defendant, and that in such settlement a bodily conflict would likely take place. When the defendant pushed the deceased out of doors—or, taking the defendant's story for the occurrence, that he agreed to go out of doors for the purpose of settling the difficulty and then engaged in a combat with the deceased—he placed himself in a position where he could not claim the right of self-defense, if the deceased assaulted him, unless, after such attack, he in good faith withdrew from the combat.

In the case of Akes v. State, 31 Okla. Cr. 386, 239 Pac. 187, this court said:

"If the defendant provoked the combat or produced the occasion in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the combat; but if he provoked the combat or produced the occasion without any felonious intent, the killing in self-defense will be manslaughter in the first degree only."

Under the evidence of the defendant and his wife and the facts and circumstances revealed in the case, the defendant was guilty of manslaughter, and the evidence and facts in the case fully justify the court in submitting to the jury the question of whether or not the defendant voluntarily entered into this combat with the deceased.

Defendant's second objection to instruction No. 12 is that it fails to instruct on the issue of the question of whether or not defendant voluntarily withdrew from the combat with the deceased. There is not a word of evidence in the record to indicate that the defendant made any effort whatever to withdraw in good faith at any time during the progress of the combat, and it appears from the evidence that he did not withdraw until such time as the deceased was wholly incapacitated to continue the combat further because of the numerous wounds inflicted upon his body with his knife by the defendant.

In the case of Gandy v. State, 34 Okla. Cr. 350, 246 Pac. 887, this court said:

"A defendant is not entitled to an instruction on an issue not raised by the evidence."

In Baker v. State, 22 Okla. Cr. 224, 210 Pac. 292, this court said:

"Where the defendant is convicted of manslaughter in the first degree and punishment assessed at the minimum under the law, and defendant's own testimony shows him to be guilty of the crime of which he was convicted, alleged errors in the instructions and in the refusal to give a requested instruction will not be held prejudicial." See, also, Morris v. State, 35 Okla. Cr. 5, 247 Pac. 418; Canada v. Territory, 12 Okla. 409, 72 Pac. 375.

Defendant next contends that the court erred in admitting certain incompetent, irrelevant, and immaterial

testimony over the objection and exception of the defendant. This assignment of error relates to certain testimony given by Mrs. Joe Baccus, a witness for the state, to the effect that on the evening of the homicide, and just an hour or two before its commission, this defendant was at her house and stated that he was going to have to kill a couple of fellows, naming them (neither of whom was the deceased), because of their attentions to his wife. Defendant contends that this evidence was inadmissible and prejudicial for the reason that it had no bearing on the question of his attitude towards the deceased.

In the case of Sears v. State, 27 Okla. Cr. 311, 227 Pac. 899, this court said:

"Threats of a general or indefinite nature, made by an accused person, where they tend to disclose general malice, may be shown, although not particularly directed against the deceased, but against a class of persons which includes the deceased."

The evidence in this case shows it was the contention of the defendant that the deceased, Russell Breedlove, had become entirely too familiar with his wife, and that such familiarity was the direct cause of the trouble between the defendant and deceased which resulted in the defendant killing the deceased. Under the case of Sears v. State, supra, these threats were admissible, as they tended to show the defendant's state of mind just a short time before the killing as against any one who was guilty of undue familiarity with defendant's wife.

While the conduct of the deceased was reprehensible, and this court does not undertake to condone the same, the taking of human life is a serious matter which cannot be justified under circumstances like those appearing in this case. The defendant had a fair trial, and the jury found

him guilty upon sufficient evidence, and no doubt considered the misconduct of the deceased in fixing the penalty of the defendant at the minimum provided by law.

No substantial error appearing upon the record, the cause is affirmed.

EDWARDS, P. J., concurs.

DAVENPORT, J. (dissenting). I cannot agree with the majority opinion wherein it is held that instruction No. 12 properly and correctly stated the law applicable to the facts in this case, nor can I agree that the testimony of Mrs. Joe Baccus, wherein she testified to alleged threats the defendant should have made prior to the dance, was admissible, as the threats as testified to by Mrs. Baccus in no way whatever could have related to the deceased, for the reason that, at the time the alleged threats were made, if they were made, the deceased and defendant were friendly, and subsequent to that time the deceased and defendant, his wife, and others went to the dance together.

In order to state my views on this question, it is deemed necessary to set out, in substance, the testimony. The testimony of the state shows the evening of the trouble, Jack Mullinax, Russell Breedlove, Stella Mae Baccus, and Ruby Mullinax went to the home of the defendant and invited the defendant and his wife to accompany them to the dance; they all went to the dance together. The testimony further shows that after they arrived at the Freeney home the deceased was dancing with the wife of the defendant; the defendant told the deceased he did not like for him to be dancing with his wife, and some conversation took place between them. Some of the witnesses say that defendant pushed the deceased toward the door, and others say he walked voluntarily; other witnesses for the state testify that after the deceased came out in the

yard they heard him talking in an ordinary tone of voice, and the defendant told deceased he did not want to have any trouble with him, or words to that effect, but that he did not want him to dance with his wife as he had been dancing when defendant spoke to him in the house. The witness said he turned and heard a lick struck; when his attention was directed toward them they were fighting and finally they came to the ground, and the witness says he heard the defendant say, "He is choking me to death." Some of the witnesses say they did not hear the defendant say, "He is choking me to death."

The testimony further tends to show that, after the defendant made the statement that the deceased was choking him to death, the deceased and defendant in some way became separated and the defendant ran, Jack Mullinax started to pursue him, but did not catch up with him; it was then discovered that the deceased had been cut several times with a knife.

The state did not introduce any testimony showing definitely what took place after the parties went into the yard, or who struck the first lick; all the state witnesses say they heard the lick struck, and when their attention was again directed to the parties they were fighting, and soon they were down on the ground; they did not know the position of the parties excepting one of the state witnesses testified he heard the defendant say, "He is choking me to death." No one interfered or attempted to separate them; other witnesses say that, if the defendant made that statement, they did not hear it.

Mrs. Joe Baccus, called as a witness on behalf of the state, testified, in substance, that the defendant was at her house about 7 or 7:30 the evening of the trouble, and over the objection of the defendant was permitted to tes-

tify that the defendant was going to cut Andrew Davis' entrails out and Pete Warner's head off; that he gave as a reason that these parties wanted the witness's daughter and defendant's wife to go car riding with them.

The defendant in his own behalf testified the parties came up the evening of the dance, and he and his wife went with them to the dance; the defendant stated:

"I danced the first set with Fanny Freeney and then quit dancing and went over in a corner; I thought all the parties were my friends; Russell Breedlove was dancing with my wife; he commenced to put his arms around her and pulled her up close to him and said, 'You don't care for me squeezing you up, do you?' And Irene said she did and pushed him back, and he pulled her up again and tried to kiss her, and I went over and put my hand on his shoulder and said, 'Russell, I object to this,' and he said 'How are you going to help yourself,' and I said, 'There are plenty of ways but I don't want to have no trouble.' About that time Jack Mullinax said to get out of the house; Russell said, 'Come out side and we will settle it'; we went outside; I did not push him out; when we got out in the yard I tried to talk with him and show him; I knew he was drinking, I said: 'Russell, you are drinking,' and he said, 'You are damn right, and God damn glad of it.' He hit me twice in the stomach and once in the breast and called me a bastard, and we went to fighting; I was striking him with my fist and somebody tripped me, I coud not see who it was; I fell to the ground and Russell Breedlove jumped on top of me and commenced to choke me, and I said, 'He is choking me to death.' Jack Mullinax said, "Choke the son of a bitch to death, and I will pay your fine.' I got my knife out and went to cutting on him; I was lying on my back, I tried to break his arm but couldn't; I did not want to hurt him but I did want to get loose; I went into my pocket and got my knife; he was on top of me and had me by the throat; I had on overalls and a white shirt; I had taken my hands over the top of him and opened the knife, after I had tried to pull his fingers loose; I cut him

across the arm, I don't know how many times I cut him, I wanted to breathe and couldn't say a word; I thought he was going to kill me; we did not go to our knees any time, I was tripped and fell backwards; I don't know which one of the boys tripped me; I was down on the ground and the deceased was choking me; I finally cut him and got loose and jumped up and ran, and Jack Mullinax ran after me; I ran off and left my wife there at the dance; the reason I ran was Jack Mullinax was after me with his pocket knife and said he was going to kill me; I would not have cut the deceased if I had not thought it was necessary to save my own life."

On cross-examination witness stated:

"When deceased got hold of my throat and began choking me I holloed he was choking me to death; deceased was on top of me; I reached over him and opened my pocket knife. When I went over in the room and talked with deceased I shut my knife and put it in my pocket; I had it open cleaning my finger nails prior to the time I went over and spoke to him."

The defendant called P. W. Nance, who testified he was undersheriff; he saw the defendant when he was arrested at Frank Pittmans; he did not examine him that night, but did the next morning; his throat was bruised and scratched with finger marks; it was swollen a right smart the next morning; the finger marks on the throat here (indicating) ; his throat was bruised; the prints of nails were still apparent; one of his ears was pretty badly swollen, looked like it had been pulled loose; "that night I was at their house and his mother came over and told me the defendant was at Mr. Pittmans and for me to go over after him, and I told her to tell him to come over, and she said she had rather I come over there and get him;" the defendant seemed to be under the impression the other parties were after him and it was unsafe for him to be out; that Mullinax was after him and ran him down to the fill-

ing station; "I saw Mullinax that night and he was drinking."

On cross-examination witness stated he did not know when the marks were put on defendant's neck, "as I did not examine him until the next morning." On redirect examination he stated there was blood on the front of his clothing; he had on a jumper and overalls.

P. C. Grisham also testified to seeing the defendant the next morning after he was arrested:

"I was surprised to see him in jail and asked him how he come to be there and he said he had had a little trouble; I saw blood on his clothing and asked him about it and he said he cut Russell Breedlove at the dance; I noticed the marks on his throat; there were four prints of the fingers and the thumb as far back as a person could reach, and his throat was swollen very near to the edge of his chin; the finger and thumb prints I cannot describe in exactly what way."

Mrs. Stella Smith, the mother of the defendant, testified:

"I was at home when the parties came and asked Leonard and his wife to go to the dance; Stella Mae Baccus came over and was telling about the trouble and said Leonard was not to blame; Jack Mullinax came down there and said, 'You tell Leonard Smith I will get the son of a bitch, I am after him,' that is what he said."

Irene Smith, the wife of the defendant, was called, and, after stating with whom she and her husband went to the dance, said:

"When they began the second set Russell said, 'Come on Irene and let's dance,' and he said, 'I hear you are married now, where do you keep yourself all the time,' and I said, 'Yes, sir.' And he said, 'I guess you are jealous of your old man; you don't care if I hug you before your old

man, do you?' and I tried to push him back and he pulled me up 'close to him, and my husband came up and said, 'I object to your dancing with my wife.' Russell said, 'How are you going to help yourself,' and my husband said, 'There are plenty of ways,' and Russell Breedlove invited him outside, and they went out of doors; I went outside and Jack Mullinax told me to go back into the house, they would attend to that; I stayed on the porch, and Jack Mullinax hollowed, 'Kill the son of a bitch and I will pay your fine.' That is what he said; I heard Leonard call for help, and that he was choking him; Mrs. Mullinax said to get a brick and go out and kill the son of a bitch, 'they couldn't choke my man;' Leonard called for help but there wasn't any of them helped him, and Jack Mullinax wouldn't let me out, he pushed me back and said they could attend to that."

On cross-examination the witness was asked:

"If what you testified is true, why did you tell your husband at Hobsons Garage he was a jealous fool, that Breedlove had not done anything to me. A. I did not tell him that.

"Q. Not before Raymond Hobbs? A. No, sir, I didn't.

"Q. What did you mean when the women folks told you to come and stop the fight, to let the jealous fool alone? A. I did not say that."

An effort was made on behalf of the state, in rebuttal, to impeach Irene Smith by showing that the reputation of Irene Smith for truth and veracity was bad. Some of the witnesses stating it was good, and some who had lived in the community for some time saying it was bad.

This is, in substance, the testimony in the case. At the close of the state's testimony the defendant filed a demurrer to the evidence offered by the state on the ground that the same was insufficient to charge the defendant

with any violation of the law of the state of Oklahoma, as charged in the information, which demurrer was considered by the court and overruled, and the defendant excepted.

The defendant has assigned nine errors alleged to have been committed by the court in the trial of his case. The first being:

"The court erred in overruling the motion of the defendant, plaintiff in error, for a new trial.

"2. Error of the court in excluding competent, material and relevant testimony in behalf of the defendant in progress of the trial.

"3. Error of the court in admitting incompetent, irrelevant and immaterial testimony offered by the state, over the objection of the defendant, during the progress of the trial."

The first and third assignment will be considered together, as they cover the important errors upon which the defendant relies for a reversal of this case. It is contended by the defendant that the court erred in giving instruction No. 12, which is as follows:

"Whenever a person voluntarily enters into a conflict, or mutually agrees with his adversary to engage in a voluntary conflict and enters therein after such mutual agreement, such person thereby waives his right of self-defense, and no matter how hard pressed he may find himself during the engagement, if he kills his adversary, he is guilty of manslaughter in the first degree and a plea of self-defense will not avail him."

The testimony on behalf of the state shows that the deceased and defendant were directed by Jack Mullinax to leave the house, and, when they went into the yard, the state's witnesses heard them talking in an ordinary tone of voice, and then a lick was struck and deceased and de-

fendant were fighting and shortly went to the ground, when one witness heard the defendant say he was choking him to death. This is not controverted by any other witness of the state. The wife of the defendant testified as to what the argument came up about and what the deceased had done to her before they went out of the house, and that the action of the deceased attracted the defendant's attention by the manner in which the deceased was dancing with the wife of the defendant.

The testimony further shows that, when she heard her husband say he was choking him to death, she wanted to go to him and Jack Mullinax prevented her from doing so; Mullinax being the same man who followed the defendant after he had gotten loose from the deceased and ran.

The defendant in his own behalf states that after he got out in the yard he talked to deceased and tried to tell him he was drunk, and deceased boasted he was glad of it, using an oath, and defendant says the deceased then struck him a time or two and they went to fighting, and some one tripped him and he fell and the deceased was on top of him choking him, and he called and told them he was choking him, and no one attempted to get the deceased off of him and he drew his knife from his pocket and cut the deceased until he got loose, and when he got loose he got up and ran. There is a great deal of testimony brought out by the state tending to show or reflect upon the character of defendant's wife, and, for some reason unexplained in the record, they attempted to show that the deceased and the defendant each had a venereal disease. What this had to do with this case is not disclosed by the record. No one objected to its introduction and the court permitted it to go into the record. Mrs. Joe Baccus was permitted, over the objection of the defendant, to testify as to a con-

versation that had taken place several hours before the trouble, and to detail what she claimed were threats by him against Andrew Davis and Pete Warner; neither of the men named by Mrs. Baccus had anything to do with the difficulty at the dance, so far as the record shows, nor were they related to the deceased or the defendant, and could have no bearing on the case other than to try to prejudice or influence the minds of the jurors against the defendant.

The record discloses that, when the parties went to the dance the night of the fatal trouble, the deceased went with others to the house of the defendant and got them to accompany them to the dance; not a word in the record shows there was any ill feeling between the deceased and the defendant at the time Mrs. Baccus claims the threats were made against Davis and Warner.

In Wireman v. Commonwealth, 206 Ky. 828, 268 S. W. 586, the fifth paragraph of the syllabus says:

"In prosecution for killing O. C., evidence that several weeks previously defendant had threatened to kill one R. B. A. and 'another man' held inadmissible and prejudicial, as threat as to 'another man' was too remote and indefinite and threat to kill a particular person other than deceased is inadmissible."

In the body of the opinion, the court, in discussing the case says:

"There is nothing in the record to show that the deceased was the other man and, as the threat was made a month or more before the homicide, we conclude that it was too indefinite and remote to be admissible. * * * A threat to kill a particular person other than the deceased is not admissible."

In this case the testimony tends to show that the deceased was drinking and struck the first blows, and, un-

der the record in this case, it was apparent that the case is a close one on the facts; and, in view of the fact that the jury in this case gave the defendant the minimum punishment, the testimony as to the threats permitted to go to the jury may have turned the scales against the defendant by causing the jury to reject the defendant's story of self-defense. We believe the admission of the testimony of Mrs. Baccus was prejudicial, and that the action of the court in admitting the same was error.

It is next contended by the defendant that the court erred in giving instruction No. 12, supra, which substantially prejudiced the defendant's rights and deprived him of a fair and impartial trial. The instruction complained of by the defendant seems to have been predicated upon the fact that the defendant had voluntarily entered into the fight. The testimony of the state fails to show who struck the first blow; the defendant testified positively that the deceased struck him two or more times before he entered into the fight; that he told the deceased he did not want to have any trouble, and when he struck back and was fighting the defendant some one tripped him and he fell and the deceased was on top of him, choking him, and he could not get loose and took his pocket knife out of his pocket and cut the deceased until he got loose. One of the state witnesses testified the deceased had the defendant around the neck, and corroborated the defendant to the extent that the defendant said he was choking him to death. The defendant contends that when he called and said the deceased was choking him to death that that announcement amounted to an abandonment of the difficulty and he wanted some one to take the deceased off of him. The theory of the defendant is that he was forced into the fight with the deceased, that some one tripped him and he fell with the deceased on top of him with his

hand on his throat, and that he could not release himself, and that deceased choked him until he could hardly breathe, and, in order to get loose from the deceased and to save himself from great bodily harm or losing his life, he cut the deceased. Nowhere in the instruction complained of does the court attempt in any way to advise the jury of the defendant's right of self-protection, or to defend himself against losing his life or receiving great bodily harm. The instruction of the court does not cover the theory of the defendant's case.

In Larry v. State, 10 Okla. Cr. 340, 136 Pac. 596, in the second paragraph of the syllabus, the court said:

"Where the killing is done in mutual combat, entered into willingly, and in the knowledge of its liability to cause death to one or the other of the combatants, the defendant cannot justify on the ground that it was committed in self-defense, and it will be manslaughter at least unless the defendant can prove that before the fatal shot was fired he had refused any further combat and had retreated as far as he could with safety, and that he killed his adversary of necessity to save his own life or his person from great bodily harm."

In this case the testimony of the state admits that the defendant was on the ground and the deceased was on top of him. It is not clear as to what the deceased was doing to the defendant, but it is uncontradicted that the defendant had stated the deceased was choking him to death, and that the defendant, after he made this statement, succeeded in getting loose from the deceased and getting up, and as soon as he did so he ran away from the scene of the difficulty. The defendant contends that, when he made the statement he did that the deceased was choking him to death, the expression amounted to an abandonment of the difficulty, as the deceased was on top

of him and he could not get up, and he could hardly breathe, and the only way to save himself from being killed or receiving bodily harm was to draw his knife and use it in his necessary self-defense.

The only positive testimony as to who started the fighting is the testimony of the defendant that Breedlove struck him two or three times before he struck back; they were fighting in the dark, and the testimony shows that the deceased was surrounded by a number of his friends who were backing him up, and who refused to permit the wife of the defendant to come to where the fight was going on.

It is my opinion that under the rule announced in Larry v. State, supra, the court erred in giving instruction No. 12. The instruction given by the court correctly stated the law as far as it went, but such instruction was not in conformity with the issues in this case. The court should have gone further and instructed the jury on the defendant's theory of the case by advising the jury that, if they believed from the evidence that before the defendant cut the deceased with his knife he had abandoned the combat as far as he could, and that, if the deceased continued to choke the defendant and the defendant struck the fatal blows that took the life of the deceased, believing at the time he struck them there was apparent danger of losing his life, or receiving great bodily harm, they should acquit him. I believe the admission of the testimony of Mrs. Joe Baccus was an error, and that instruction No. 12, as given, did not state the law as applied to the facts in this case.

For the errors herein stated, the judgment should be reversed.