## STEVE ALEXANDER v. STATE.

No. A-9485. May 19, 1939.

(90 P. 2d 949.)

Counts & Tippit, of McAlester, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and W. J. Counts, Co. Atty., of McAlester, for the State.

BAREFOOT, J. Defendant was charged with murder in Pittsburg county; was tried, convicted of manslaughter in the first degree, and sentenced to serve four years in the penitentiary, and has appealed.

The first contention of defendant is, that the court erred in overruling his motion for a continuance. This contention is based upon the fact that defendant filed a praecipe for a witness on the 2d day of October, 1937, and that the subpoena did not reach the deputy sheriff for service until the afternoon of October 4, 1937, and that the witness had left the county and could not be served. And he alleges "that if said cause is continued that he can procure the evidence of the said Wister Standerfer by the next term of court." It was set out in this motion that this witness would swear that a few days prior to the killing of deceased by defendant, he had ridden in a truck with deceased and his son, and that deceased said he was going to have some trouble with defendant over a woman, "but that it did not make any difference to him, that he was prepared for him, and at that time deceased exhibited to him a six-shooter that he was carrying." At the time the motion was presented counsel for defendant offered evidence to substantiate the facts with reference to the filing of the praecipe and the issuance of the subpoena. The court stated he would take for granted that all the facts alleged in the affidavit for continuance were true, that the witness was not an eye-witness, and he would overrule the motion. We have examined the record and do not find that the court erred in overruling this motion under the decisions of this court. Ford v. State, 23 Okla. Cr. 46, 212 P. 444; Musgraves v. State, 3 Okla. Cr. 421, 106 P. 544; Luce v. State, 36 Okla. Cr. 49, 252 P. 452; Williams v. State, 17 Okla. Cr. 452, 190 P. 892; Vineyard v. State, 22 Okla. Cr. 76, 209 P. 783; Litchfield v. State, 8 Okla. Cr. 164, 126 P. 707, 45 L.R.A., (N.S.), 153. The affidavit does not show that the statement made by deceased was ever communicated to defendant. There is an entire lack of diligence on the part of the

defendant in procuring this witness, and very little to show the possibility of having the testimony if the case was continued. This does not occur to us as an extraordinary delay, and we are unable to say there was an abuse of discretion by the trial court in overruling the motion. In the case of Morehead v. State, 12 Okla. Cr. 62, 151 P. 1183, Ann. Cas. 1918 C, 416, cited by defendant, the facts were very much different from the facts surrounding this application. In that case the death penalty was assessed, all of the witnesses were eye-witnesses, the defendant had been confined in the jail and the penitentiary from the time of his arrest until his trial, and the praecipe for the subpoena had been filed and subpoenaes issued on April 27th, and the trial was set for May 8th. The affidavit also showed due diligence on the part of the defendant. The same applies to the cases of Teter v. State, 7 Okla. Cr. 165, 122 P. 1115, and Payne v. State, 10 Okla. Cr. 314, 136 P. 201.

It is next contended by defendant that the evidence was sufficient to sustain the verdict. The defense offered in this case was: (a) self-defense, and (b) insanity. It is revealed by the record that defendant was 40 years of age, and had resided in Hartshorne, Pittsburg county, all of his life, and had worked in the coal mines 22 years, and until they closed, and was now driving a truck on W.P.A. That he had married Ida Westfall when she was 15 years of age and he was 19. That they had 8 children, 7 of whom were then living, and their ages ranged from 2 to 18 years. That he owned his own home until the mines closed. That he had never had any trouble with his wife or family until about July 10, 1937, when on that night he returned to his home and she was not there. That he prepared his supper, and finally went to bed, but could not go to sleep. That she did not return until about 2:30 or 3 o'clock a. m. That at this time she came in with her sister, Mary Irvin, and they were both drunk. That they told him they had been to Krebs drinking beer. That he told his wife "to get out and stay out," and that she left home.

That he could not sleep and finally got up and dressed, and went to Mary Irvin's home. He was there told by Mary Irvin that she and his wife had gone with "Estol Barnes," the deceased, to Krebs and drank beer, and that his wife got very drunk, and she had kept her out for the purpose of sobering her up, but also assured him she had done nothing wrong, and he took his wife home. That he continued to live with his wife as usual, and worked on W.P.A., and started to hauling hay for Albert Long and Bill Barnhill. That he became sick, and was examined by two physicians who said he had "gonorrhea." The evidence revealed that his wife admitted to him she had intercourse with the deceased, Estol Barnes, and that she had taken this disease from deceased and had transmitted it to him. This evidence was given by a daughter of defendant who heard the conversation between her father and mother. Different doctors also testified that the deceased, the defendant, and defendant's wife were all afflicted with this disease. A great deal of evidence was introduced in reference to this matter, and a great deal was offered which the court did not permit to go to the jury, and to which reference will be made later.

The facts pertaining to the actual killing were that deceased, on the 5th day of August, 1937, entered "Gooby's Lunch Room," in the city of Hartshorne, and ordered a dish of chili. He was sitting on a stool facing the south and with his back to the entrance door at the north. That as he raised his spoon to his mouth, the defendant entered the door at the north. He immediately raised his gun and fired two shots at deceased, both of which struck deceased in the back and passed through his body. That deceased started toward the back of the building and one more shot was fired by defendant. That deceased, when he reached the outside door, collapsed. He was examined by a doctor and others and was taken to a hospital and died as a result of the gunshot wounds inflicted by defendant.

The above evidence was given by four eye-witnesses who were in the lunch room and witnessed the shooting. Two of them were young ladies who were working there, and the other two were customers who were being served. There was no material difference in the testimony of these four witnesses. There was no testimony on the part of any witness with the exception of defendant that the deceased made any movement or demonstration of any kind toward defendant. All of the witnesses testified he had no firearm, or weapon of any kind. After the shooting defendant walked up the street with his gun in his hand and was arrested by an officer to whom he surrendered.

From a statement of the evidence as above outlined, it will be seen that the evidence was not only sufficient to convict the defendant of manslaughter in the first degree, but that it would have sustained a verdict of murder.

We shall now refer to some of the specific errors assigned. It was, and is, contended by defendant that he was insane at the time he fired the fatal shots which took the life of deceased, and that the court erred in refusing the admission of certain evidence by nonexpert witnesses as to their opinion as to his sanity. We have carefully read the record. The trial court, following the rules announced by this court in the cases of Turner v. Territory, 11 Okla. 660, 69 P. 804; Lee v. State, 30 Okla. Cr. 14, 234 P. 654; Queenan v. Territory, 11 Okla. 261, 71 P. 218, 61 L.R.A. 324, excused the jury and heard the evidence of the nonexpert witnesses, permitting them to give the facts upon which they based their opinions, and if he deemed it insufficient, he refused to permit the same to go to the jury; if he deemed it sufficient he permitted the jury to hear the same. The court adhered to the rule that evidence of illicit relations between the deceased and the wife of defendant was admissible only when communicated to the defendant, and this for the purpose of the effect upon the mind of defendant as affecting his sanity. This, of course, was proper, because if defendant had not known of this relationship it

could not have affected his mind. The court permitted a number of witnesses to testify to the fact that they communicated to defendant the fact that the deceased had intercourse with his wife. That he had given her a loathsome disease, and that the same had been transmitted by her to defendant. He permitted evidence to be offered showing that the defendant, the deceased, and the wife of defendant were all afflicted with this disease. The jury had all of these matters fully before them, and under a full and complete set of instructions given by the court, fully setting forth in an excellent and exhaustive manner every issue involved in this case, they passed upon the issues of fact. The verdict which they rendered finding defendant guilty of manslaughter in the first degree and assessing his punishment at four years in the penitentiary clearly demonstrates that the jury gave every consideration to the defense offered in behalf of defendant. The testimony of the eye-witnesses shows that defendant shot the deceased in the back, and at a time when he was in no way making any hostile demonstration toward the defendant. It is doubtful if he knew of defendant's presence until the fatal shots were fired. He had no weapon of any kind. There can be no sympathy expressed for the deceased in his treatment of defendant and his family. A broken home, the transmitting of a loathsome disease to his wife, and she transmitting it to the defendant was such to cause him, as a red-blooded man, to desire to avenge the despoiler of his home and fireside. But the laws of this state and of this country do not permit one to take the law in his own hands under circumstances such as this. This act was committed on July 10th, and soon thereafter was known to defendant. No action was taken until the 5th day of August. There was no sudden heat of passion. There was ample time for cooling and reflection. If defendant's mind was alert and active on July 10th, it was a very short time for him to become insane between that and the 5th day of August, at the time of the shooting in this case. The true test of criminal responsibility, where the defense of insanity

is interposed, is whether the defendant had sufficient reason to know the nature and quality of his act and whether he had sufficient reason to know right from wrong. Owen v. State, 13 Okla. Cr. 195, 163 P. 548; Smith v. State, 12 Okla. Cr. 307, 155 P. 699. The jury found him guilty of manslaughter in the first degree and gave him the benefit of the lowest punishment. We do not find that any error was committed which deprived the defendant of any substantial right. An examination of the record reveals that the testimony of several nonexpert witnesses was permitted to go to the jury and they were permitted to say from the facts which they had observed that, in their opinion, the defendant was insane at the time he committed the act in controversy. The law of this state does not recognize what is known as the "unwritten law." Posey v. State, 50 Okla. Cr. 129, 296 P. 527; January v. State, 16 Okla. Cr. 166, 181 P. 514; Pickett v. State, 40 Okla. Cr. 289, 268 P. 732.

In the case of Lee v. State, supra, the facts were very similar to those in the case at bar. This case gives the testimony offered by certain nonexpert witnesses, and it is very much like the evidence here offered and part of which was excluded. However, in the instant case the court permitted much of the evidence to go to the jury and the jury was permitted to judge the weight thereof. Marshall v. Territory, 2 Okla. Cr. 136, 101 P. 139. In the Lee Case, this court said [30 Okla. Cr. 14, 234 P. 655] :

"Before submitting the case to the jury, the court instructed the jury not to consider any of the evidence relating to the question of insanity. It has been held that temperamental eccentricities of mind and conduct, alone, are not evidences of insanity. A man may do the most extraordinary things; he may recklessly squander his money; his conduct may be the subject of ridicule; he may be addicted to sudden bursts of passion and of harsh treatment towards those he should treat with tenderness; his deportment upon a particular occasion may be an outrage upon decency and propriety. All this, if it be the result of eccentricity of character, or of depraved taste, or an unfortunate temper, and does not proceed from a

permanent disorganization of the mental faculties, will not support a plea of insanity. 16 C. J. 99, 100; 32 C. J. 597; Hopkins v. State, 4 Okla. Cr. 194, 197, 108 P. 420, 111 P. 947.

"The opinion of a nonexpert witness that a person is irrational, based on observations of this character, is a conclusion merely, not warranted by the facts. Most persons have some temperamental peculiarities of thought and action that to others seem queer. The term 'irrational' is an elastic term, one that may convey one idea to one person and an entirely different idea to another. 'Irrational' may mean unreasonable, foolish, absurd, and a person in such sense may be irrational, and still not be, in any legal sense, insane. If it could be shown as a defense in every homicide case that the perpetrator at some period of his life acted queer, unreasonable, or absurd, that defense could be interposed and relied upon in all homicide cases. To establish a legal defense on the ground of insanity, there must be a showing that at the time of the commission of the deed the person accused was laboring under such a defect of reasoning, from some disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know, that he did not know that what he was doing was wrong. Notes and cases cited, 32 C. J., supra.

"Idiosyncrasies, peculiarities, or unreasonable conduct may be a symptom of insanity, where these are due to some disease of the mind, and where it is shown that at some prior period of the man's life he was not so afflicted."

In the case of Tapedo v. State, 34 Okla. Cr. 165, 245 P. 897, 899, the court says:

"In cases where insanity is interposed as a defense, opinion evidence of insanity must be based upon facts submitted as a foundation for such opinion. Mere conclusions, without a showing of facts upon which such conclusions may logically be drawn, are regarded as insufficient."

Finding no error, we are of the opinion that the judgment and sentence of the district court of Pittsburg county should be affirmed, and it is so ordered.

DOYLE, P. J., and DAVENPORT, J., concur.