## CLARENCE WAYNE HUDMAN v. STATE.

No. A-10924.     April 20, 1949.

(205 P. 2d 1175.)

162

Wilson & Wilson, of Frederick, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Owen J. Watts, Asst. Atty. Gen., for defendant in error.

JONES, P. J. The defendant, Clarence Wayne Hudman, was charged by an information filed in the district court of Tillman county with the crime of murder, was tried, convicted of manslaughter in the first degree, and pursuant to the verdict of the jury, the defendant was sentenced to serve 30 years' imprisonment in the State Penitentiary and has appealed.

This tragedy occurred in the town of Grandfield and involved three young people. The deceased, Beldon Chitwood Lawson, referred to in the testimony as Babe, was about 20 years of age at the time of the homicide, and had only been back from the Navy about six weeks at the time the shooting occurred. The defendant likewise was 20 years of age and had served about three years in the Marine Corp, being discharged in March, 1946, about four months before the tragedy occurred.

Doris Lamb, a 17 year old girl, lived with her parents about eight miles from Grandfield.

Prior to the time the defendant enlisted in the Marine Corp, he had a few dates with Doris Lamb. After his discharge, he again started keeping company with this young lady, became engaged to her and gave her an engagement ring. The parents of Doris Lamb objected to Doris keeping company with the defendant, and about three weeks before the homicide in a conversation at a drugstore in Grandfield, Doris told the defendant their engagement was off, and according to the testimony of Doris, she offered to return the engagement ring but defendant refused to take it. At the same time, according to her testimony, the defendant made threats against members of her family.

The deceased, Babe Lawson, prior to his enlistment in the Navy, had also dated Doris Lamb, and after his discharge from the Navy, and subsequent to the breaking of the engagement between defendant and Doris, the deceased commenced keeping company with her again.

On Saturday afternoon, July 6, 1946, Doris Lamb was in the town of Grandfield. About 1:30 p. m., as she and a girl acquaintance were emerging from a store, the defendant walked up and asked Doris to talk to him but she refused and walked on down the street. Later, while Doris Lamb and her girl friend, Patricia Carroll, were waiting in an automobile in front of the Rexall Drug Store, the deceased and his brother, Robert, came up to the automobile and the defendant also came to the car at that time. Doris then introduced the defendant and the deceased; all the boys then departed. Later, at the suggestion of Robert Lawson, the two girls and the two Lawson boys drank Coca Colas together in the drug-

store; thereafter, they all drove to a service station but Doris went back to the drugstore to make a telephone call, leaving Patricia Carroll and another girl, Marjorie Varner, in the automobile. While these parties were at the service station, they saw the defendant coming south from the direction of his home at a very fast rate of speed, driving a Ford coupe. It was the state's theory that the defendant at that time was coming from his home where he had picked up the gun which was used in the homicide.

The parents of the defendant owned a grocery store the third door west of the Rexall Drug Store, and they lived about two blocks from the drugstore. Later, on Saturday afternoon, the two Lawson boys returned to the drugstore and Babe Lawson went in and met Doris about 4 p. m. The deceased and Doris came out of the drugstore and turned west; the defendant was coming from the west; when he reached Doris and the deceased, he took hold of her arm and said "I want to talk to you", and Doris said "No," and the defendant repeated his request two or three times. At that time, the deceased made a remark to the defendant to either "Wait a minute", or "Hold on there".

The testimony of people who claimed to have seen the fatal conflict differed as to who struck the first blow. Some of the state's witnesses testified that when the deceased spoke to the defendant and asked that he desist, the defendant released his hold on Doris' arm and struck the deceased in the face with his fist; that the deceased then struck the defendant and almost knocked him down and against the window at the front of the White Front Grocery which was next door to the Rexall Drug Store. When the defendant regained his feet, he pulled a gun which was a 22 Navy target pistol on a 45

calibre frame and struck at the deceased several times. The defendant then backed away and shot deceased, the bullet entering the body above the collar bone on the left side. The bullet did not cause instant death, but the deceased was able to turn and enter the drugstore. Shortly after deceased entered the drugstore, the defendant ran into the drugstore and struck the deceased on the side of the head with the pistol, knocking the deceased into the aisle between the booths and soda fountain, and defendant commenced kicking the deceased. The owner and an employee of the drugstore, together with other individuals who were in the drugstore, grabbed the defendant and were able to subdue him and take the gun away from him. The deceased was removed to a hospital where he died shortly thereafter.

The defendant interposed a plea of temporary insanity at the time of the commission of the homicide. Testimony of men who had served in the Marine Corp with the defendant was taken by deposition and they related an occurrence which had happened in Japan where the defendant had acted in an abnormal manner. Other witnesses testified to peculiar actions of the defendant after his discharge from the Marine Corp.

The plea of insanity was based principally upon the theory that the defendant had become weakened mentally because of combat fatigue suffered during the war; that because of this weakened mentality, the refusal of his girl friend to marry him, and her association with another boy aggravated his mental disease and caused him to become mentally unbalanced at the time the fatal encounter occurred.

Doctor Hugh Galbraith, a psychiatrist from Oklahoma City, testified at length in support of defendant's theory and gave his opinion that at the time of the hom-

icide the defendant did not know the difference between right and wrong.

In rebuttal, the state used Doctor Moorman P. Prosser, a psychiatrist now employed at the Central State Hospital at Norman, Okla., and also a consulting psychiatrist at the Will Rogers Memorial Hospital in Oklahoma City. This Doctor who had served as a Lieutenant Colonel in the Army, as a psychiatrist, testified that he had examined thousands of cases of combat fatigue. The defendant was committed to the Will Rogers Memorial Hospital for observation in September, 1946, and Doctor Prosser had him under observation during this period of time. The Doctor testified that after five days he was released from the hospital; that there was nothing wrong with him and further testified that in his opinion, based upon facts set forth in a hypothetical question concerning the commission of the homicide, the defendant was able to distinguish right from wrong at the time the fatal shot was fired and knew and understood the nature and consequences of his act.

Seven assignments of error are presented on behalf of the accused and we shall consider them in the order in which they were presented in the defendant's brief.

It is first contended that the court committed an error and that the jury was guilty of misconduct after the submission of the case and during the deliberations of the jury. In connection with this assignment of error, the record discloses that after the jury had deliberated a few hours, they were returned to the courtroom by the bailiff and the following proceedings were had:

"By the Court: I understand from the bailiff you want some additional information. Foreman: That's right, sir. The Court: What is it. Foreman: Some of us have never served on a jury before and they don't un-

derstand how long a calendar year is at the penitentiary. We wish to have that information. The Court: Gentlemen, the court can't give you any accurate information on the amount of time that a prisoner will have to serve in prison. That's governed by prison regulations, which in turn is governed by his good behavior in compliance with the rules and regulations. There is a possibility he would have to serve every day of the calendar year. There are certain reductions upon his compliance with the prison rules and regulations of good behavior. Foreman: Some had the opinion a penitentiary year was seven months of our calendar year. Others didn't know. The Court: No, there is no such definition as a penitentiary year. But the statutes do provide for certain reductions in his time provided he complies with the rules and regulations, and upon his good behavior. Mr. Wilson: May I suggest it depends on the warden. The Court: That's governed by prison rules and regulations. Mr. Watts: May I suggest he gets certain credit for work days also. The Court: Yes. Mr. Wilson: That comes under the prison regulations. Foreman: That's all. The Court: What is the attitude of the jurors. Do you want to work awhile longer. Foreman: We want to discuss this. We couldn't get together on that part of it. The other part we practically agreed upon."

The defendant cites the case of Bean v. State, 58 Okla. Cr. 432, 54 P. 2d 675, 678, as authority to sustain his contention that the defendant suffered prejudice by reason of the above proceedings. In the Bean case, supra, the trial judge in instruction No. 12 instructed the jury that a defendant convicted of a felony and receiving a prison sentence as a punishment therefor did not necessarily have to serve the entire punishment imposed for the reason that, under the laws of this state, the defendant was entitled to a commutation of time for good behavior. Set forth in the instruction was a computation of the time given to convicts on their good behavior for

sentences ranging from four years to 99 years imprisonment.

In the body of the opinion, this court stated:

"It is clear the enacting of the statute for commutation for good behavior was never intended by the Legislature to be considered by the jury in the trial of the defendant, on the question of his guilt or innocence, or the punishment imposed by the jury. The instruction complained of as error only goes to the question of the commutation of the defendant after he had been convicted and incarcerated."

In disposing of the Bean case, supra, this court held that the giving of said instruction was an error but was not such an error as would justify a reversal of the conviction, but did modify the sentence imposed against the defendant by reason of the giving of such instruction.

We have carefully considered each word said by the foreman of the jury, the trial court, the Assistant Attorney General, and counsel for defendant. The statement of the trial court appears to be a correct and fair statement of the law. The only way the language of the court could have been improved would have been for him to have further stated:

"The question of a possible reduction of the prison sentence given to one convicted of crime because of credits on his time for good behavior is a matter which the jury should not consider in any manner".

In the proceedings hereinabove printed, counsel for the defendant also joined in the conversation between the foreman of the jury and the trial court and volunteered his opinion that the matter of reduction of the sentence was governed by prison regulations. We do not believe that there was reversible error because of this incident.

We shall later consider this assignment of error with assignment of error No. 11.

It is next contended that the court erred in refusing to permit the witness, Garland Hassenmeyer, a witness for the state, to answer certain questions asked him by counsel for defendant on cross-examination.

This witness was one of the parties who assisted in taking the gun away from defendant in the drugstore.

On cross-examination the witness testified that he had to place his foot across defendant's throat until his hands relaxed to where he could take the gun away from him.

The record then discloses:

"Q. I will ask, as a matter of fact, if his actions weren't the actions of a wild man when you was fighting with him there trying to control him? A. He was very much out of the ordinary of a sane man. Q. I will ask you, Garland, from your observance of the defendant there, observing his actions and trying to quiet him as you have described, observing his condition as you have described, I will ask you this question, in your opinion, did Clarence Hudman, at the time you came in and tried to control him, did he have the mental capacity to know the difference between right and wrong?"

The state objected to the latter question and the court sustained the objection. The defendant excepted to the court's action and then made an offer to prove that the witness would testify that in his opinion the defendant was not capable of knowing the difference between right and wrong. An objection to the offer was sustained. Counsel for the defendant contends that the court sustained the objection of the state solely upon the ground that the witness as a layman could not give an opinion as to whether the accused knew right from wrong

at the time the crime was committed. The court may have had this in mind at the time he sustained the objection, but we rather think that the court sustained the objection for the reason that it was improper cross-examination, or that no proper predicate was laid to authorize the witness to give an opinion on this question. No question had been asked the witness on direct examination concerning the mental capacity of the accused, nor was he even asked to describe the action of the accused in the drugstore. The witness merely related on direct examination that he saw a commotion in the drugstore and entered; that he saw the defendant and assisted in taking a gun from the defendant which he handed to Marvin Anderson. The direct examination consisted of only a few questions but the cross-examination consumed 13 pages in the record, most of it devoted to questions asked by counsel for defendant in an effort to bring to the attention of the jury the appearance of the defendant, his actions in the drugstore, and other matters to bolster the theory of the defendant that he was in a state of temporary insanity while he was struggling in the drugstore.

This court has held that a nonexpert witness, after first stating the facts upon which he bases his opinion, may, if these facts are sufficient upon which to base an opinion, testify as to his opinion or impression formed at the time as to the sanity of the accused. Alexander v. State, 66 Okla. Cr. 219, 90 P. 2d 949; Lee v. State, 30 Okla. Cr. 14, 234 P. 654.

On cross-examination of a witness, as a general rule, the party cross-examining should be confined to the matters concerning which the witness has been examined in chief. Often we have observed in the examination of records in cases appealed to this court where the trial courts

have been very liberal with counsel for the accused in allowing them on cross-examination to ask any question pertaining to the issues of the case. At the commencement of this case, the county attorney made his opening statement to the jury but counsel for the defendant reserved their statement until after the state had closed its case in chief. So even in a jurisdiction that applies the liberal rule of allowing any question to be asked on cross-examination pertaining to any of the issues of the case, the evidence offered to be proved by the witness was inadmissible at the time the question was asked because there was no issue of insanity in the case. This issue was not raised until after counsel for defendant made his opening statement to the jury.

The trial court did permit Moody Nunn, a nonexpert witness for the defense, to testify on the sanity issue, and if the witness Hassenmeyer had been called as a witness on behalf of the accused, it appears probable that the court would have admitted his evidence the same as he did that of the witness Nunn and others.

It is next contended that the court committed error in admitting in evidence photographs of the deceased taken several months prior to the time of the difficulty, one of which showed the deceased in the uniform of a sailor. There were two of these photographs admitted in evidence over the objection of counsel for defendant. Counsel contended that the photographs had no probative value and were offered for the sole purpose of arousing prejudice against the accused.

This court has held that photographs and pictures are admissible where they illustrate or clarify some issue of the case and whenever it is relevant to describe a person, place or thing, pictures shown to be a faithful

reproduction of whatever it purports to reproduce, are admissible for the purpose of assisting the court or jury in understanding the situation. Roberts v. State, 82 Okla. Cr. 75, 166 P. 2d 111; Cooper v. State, 61 Okla. Cr. 318, 67 P. 2d 981.

We are quite impressed with the argument of counsel for defendant that the photographs were taken too long before the time of the homicide to be admissible in evidence for any purpose. A picture of a person or place taken three years before a homicide occurs would apparently not be competent or revelant to any issue unless it was shown that the person or place shown in the picture was the same at the date of the difficulty as it was at the time the picture was made.

Counsel for the state maintain that the state had a right to introduce these pictures for the reason that the defendant was present in the courtroom; that he took the stand and the jury had an opportunity to view him and see his size and weight, and that they were entitled to an opportunity to gain some information relative to the physique of the deceased.

We have had occasion many times to discuss the admissibility of photographs and have held that the question of the admissibility of such photographs in evidence is a matter addressed to the discretion of the trial court. Jackson v. State, 67 Okla. Cr. 422, 94 P. 2d 851.

There must be a limit beyond which courts should not go in the admission of photographs. Here the defense was temporary insanity and the relative size of the parties was not particularly pertinent. We shall discuss this assignment further in connection with the defendant's proposition that the sentence assessed by the jury was excessive.

The next assignment of error is that the court erred in permitting the witness, Doctor Prosser, to testify to the results of a personal examination of the defendant while the defendant was a patient of the said Doctor Prosser at the time such examination was made.

After the commission of the homicide, the defendant made arrangements through the Veterans' Administration to be sent to the Will Rogers Memorial Hospital for examination and possible treatment. While there, he was examined by Doctor Prosser who was a psychiatrist for the hospital.

The defendant had introduced evidence by several nonexpert witnesses that in their opinion at the time of the homicide, the defendant did not know right from wrong, and in addition introduced Doctor Galbraith as an expert psychiatrist who further supported this theory of the defense. The state offered the witness, Doctor Prosser, in rebuttal to the testimony of Doctor Galbraith but the defendant contended that he was an incompetent witness and that the personal examination was a privileged communication and therefore inadmissible in evidence.

The statute relied upon is Tit. 12 O.S. 1941 § 385 which provides:

"The following persons shall be incompetent to testify: * * *

"A physician or surgeon concerning any communication made to him by his patient with reference to any physical or supposed physical disease, or any knowledge obtained by a personal examination of any such patient: Provided, That if a person offer himself as a witness, that is to be deemed a consent to the examination; also, if an attorney, clergyman or priest, physician or surgeon

on the same subject, within the meaning of the last three subdivisions of this section."

The state contends that Doctor Prosser was a competent witness under the statute for the reason that the defendant had taken the stand and testified on the same subject and further contends that where a patient is treated or examined by one or more physicians and one of the physicians is called by the defendant to testify as to the results of his examination, it constitutes a waiver of the privilege given by the statute as to all other physicians who attended the defendant, even though the other physician attended at separate and different times than the physician called to testify by the defendant.

In 62 A.L.R. at page 685, is an extensive annotation on this subject sustaining the contention of the state. We quote in part from that annotation:

"In some jurisdictions it is held that a waiver of the privilege as to one of several physicians attending the patient waives such privilege as to all of such physicians, whether they attend him in consultation and together, or whether they attend him singly and at different times. Chaffee v. Kaufman (1923) 113 Kan. 254, 214 P. 618; State v. Long (1914) 257 Mo. 199, 165 S. W. 748; Weissman v. Wells (1924) 306 Mo. 82, 267 S. W. 400; O'Brien v. Western Implement Mfg. Co. (1910) 141 Mo. App. 331, 125 S. W. 804; Oliver v. Aylor (1913) 173 Mo. App. 323, 158 S. W. 733; Michaels v. Harvey (1915) Mo. App., 179 S. W. 735 (later appeal in (1917) Mo. App., 195 S. W. 519); McPherson v. Harvey (1916) Mo. App., 183 S. W. 653; Priebe v. Crandall (1916) Mo. App., 187 S. W. 605, Capron v. Douglass (1908) 193 N. Y. 11, 85 N. E. 827, 20 L.R.A., N.S., 1003; Hethier v. Johns (1922) 233 N. Y. 370, 135 N. E. 603 (overruling decision in (1921) 198 App. Div. 127, 189 N.Y.S. 605); Dewey v. Cohoes & L. Bridge Co. (1915) 170 App. Div. 117, 155 N.Y.S. 887; Kraus v. M. & G. W. Corp. (1922) 203 App. Div. 582,

196 N.Y.S. 845; Fennelly v. Schenectady R. Co. (1922) 201 App. Div. 211, 193 N.Y.S. 641; Cretney v. Woodmen Acci. Co. (reported herewith), [196 Wis. 29, 219 N.W. 448, 62 A.L.R.] 675."

"In Capron v. Douglass (1908) 193 N.Y. 11, 85 N. E. 827, 20 L.R.A., N.S., 1003, the physicians were in consultation, and the facts of the case bring it within the exception to the general rule, but the court, after observing that it preferred to place its decision upon broad-. er ground, said: 'This action, as we have seen, was for malpractice. The plaintiff, both in his complaint and in his testimony, has fully disclosed all of the details of his affliction as it existed both at his home and at the hospital. He has given in much detail how the fractures occurred, how they were treated, his pain and suffering, and, so far as he was able to comprehend when not under the influence of anesthetics, the particulars of the operation at the hospital. He himself has therefore given to the public the full details of his case, thereby disclosing the secrets which the statute was designed to protect, thus removing it from the operation of the statute. In other words, he has waived in open court upon the trial all information which he might have kept secret, by disclosing it himself. The character of the action necessarily calls for a disclosure of his condition and the treatment that was adopted by the defendant and those assisting him. To hold that the plaintiff may waive the privilege as to himself and his own physicians, and then invoke it as to the defendant and his physicians, would have the effect of converting the statute into both a sword and a shield. It would permit him to prosecute with the sword, and then shield himself from the defense by the exclusion of the defendant's testimony. It would enable the plaintiff to testify to whatever he pleased with reference to his condition and the treatment adopted by the defendant, without fear of contradiction. The plaintiff could thus establish his cause of action, and the defendant would be deprived of the power to interpose his defense, by reason of the closing of the mouth of his witnesses by the provisions of the Code referred to. Such

a construction of its provisions, we think, was never contemplated by the legislature. It would lead to unreasonable and unjust results. Instead thereof, a construction of the provisions of the Code to the effect that when the privilege of the plaintiff has once been waived by him in court, either by his own testimony or by that of others given with his knowledge and consent, and his physical condition has been given to the public, the door is then thrown open for his opponent to give the facts as he understands them. This, to our minds, affords a more just and equitable rule, and is the one that was evidently contemplated by the Legislature.'

"In Epstein v. Pennsylvania R. Co. (1913) 250 Mo. 1, 156 S. W. 699, 48 L.R.A., N.S., 394, Ann. Cas. 1915A, 423, while the physicians attended the patient in consultation, the court seems to have decided the case upon the general ground that the patient, having opened the case himself, had thereby lost all right of secrecy as to his ailments, and in support of said ground quotes Wigmore on Evidence, vol. 4, § 2389, as follows: 'Certainly it is a spectacle fit to increase the layman's traditional contempt for the chicanery of the law when a plaintiff describes at length to the jury and a crowded court room the details of his supposed ailment, and then neatly suppresses the available proof of his falsities by wielding a weapon nominally termed a privilege.'

"Objections to the testimony of a physician touching the mental incompetency of a testator, when such physician's information was acquired through his professional attendance on the testator, is waived when the defendant, who objects to such testimony, introduces as witnesses on his own behalf other physicians who similarly acquired their information and who likewise testified to the mental capacity of the testator. Chaffee v. Kaufman (1923) 113 Kan. 254, 214 P. 618.

"And if a patient is suffering from a given malady, and is treated by several physicians for the selfsame trouble or malady, and she and one of her physicians, with her consent, make public the character of her trouble,

she has waived the right longer to keep the exact character of that trouble further secret, and the other physicians are competent to testify as to what the malady or trouble was in reality; any other rule would be but to permit a patient in a court of justice to play both fast and loose. State v. Long (1914) 257 Mo. 199, 165 S. W. 748.

"It has been held, also, that the plaintiff in a personal injury action, who by her own testimony, and that of one of her physicians, goes fully into the subject of her maladies, exposing everything and concealing nothing, waives any objection she might have to the testimony of another physician who had attended her during the preceding year, and whose testimony would tend to prove that the malady of which she complained had not been caused by the injury, but was one of long standing. McPherson v. Harvey (1916) Mo. App., 183 S. W. 653. And under such circumstances where several physicians have treated the patient for the same trouble, it can make no difference that the treatment was at different dates."

The Oklahoma statute hereinabove quoted recognizes that if the person offers himself as a witness, or offers a physician as a witness who testifies on the same subject, such action constitutes a waiver of the privileged communication.

The record discloses that the defendant testified at length concerning what his physician described as abnormal conduct, which included everything from (bed wetting as a boy) to running berserk in Japan on one occasion while with some companions after the end of the war because of an overdose of Japanese intoxicating liquor.

Doctor Hugh Galbraith, the physician who testified on behalf of the accused, related the symptoms as given to him by the defendant and the members of the defendant's family, and from this history he expressed an opin-

ion that the defendant did not know right from wrong or the nature and consequences of his act at the time of the commission of the homicide.

An examination of the record shows that Doctor Prosser did not testify to any fact discovered by him in talking to the accused at the time he was admitted to the Will Rogers Memorial Hospital which was not discussed by Doctor Galbraith. It just happened that the two eminent Doctors used the same facts but arrived at different conclusions. Doctor Prosser stated that, in his opinion, the defendant was suffering from what he termed as chronic emotional instability and further stated at the time of the homicide he was of the opinion that the defendant was capable of distinguishing right from wrong and knew the nature and consequences of his acts on that date. Doctor Prosser further stated that it was his opinion that the defendant at the time of the fatal altercation was in a rage reaction, or a period of unbridled temper.

It is our conclusion that when the defendant testified with reference to certain physical ailments which his Doctor stated were symptoms of insanity, and when he called as a witness an examining physician on the same subject, it constituted a waiver of the defendant's right to object to the testimony of any other physician who examined him on this particular subject. The Supreme Court of Oklahoma has so held in many cases. Roeser v. Pease, 37 Okla. 222, 131 P. 534; Fulton-Morris Coal & Mining Company v. Mitchell, 37 Okla. 575, 132 P. 1103, 1104; City of Tulsa v. Wicker, 42 Okla. 539, 141 P. 963; Lazzell v. Harvey, 174 Okla. 86, 49 P. 2d 519.

In Roeser v. Pease, supra, [37 Okla. 222, 131 P. 537] the Supreme Court of Oklahoma stated:

"If she can go upon the witness stand and testify that she had not suffered from these afflictions prior to the accident, and then prevent the only available impeaching testimony from being disclosed, by a claim of privilege, it would seem that a mockery is being made of justice, and we do not think our statute contemplates such a condition. The theory upon which the privilege is based is that a person is entitled to have his physical disabilities protected from public curiosity. If, however, he goes into a court of justice and bases an action upon the existence of a physical disability, and testifies himself as to its existence or non-existence, he, of course, is not entitled longer to claim a privilege for his condition, and the statute does not contemplate protecting him in such case. An interesting discussion of the subject is contained in the fourth volume of Wigmore on Evidence, §§ 2380, et seq."

We do not think that the case of Clapp v. State, 74 Okla. Cr. 144, 124 P. 2d 267, which is cited and relied upon by the defendant as authority to sustain this proposition, is in point because of a different factual situation.

The next two propositions of the defendant because they are so closely related will be considered together. The alleged error of the court consists in admitting purported threats made by the defendant against one G. W. Lamb and sisters of the witness, Doris Lamb. Also an alleged error of the court in permitting evidence of such threats after a prior ruling at the beginning of the trial that such threats would not be permitted unless the defendant's good reputation was placed in issue by the defense and that by reason of the action of the court the defendant was induced to release his character witnesses from attendance at the trial.

On cross-examination, the defendant was asked if he did not have a conversation with Doris Lamb about three

weeks before the fatal difficulty in which he told Doris that he was quicker on the trigger than her father and threatened Doris' two sisters if they did not refrain from interfering with his relationship with Doris. On redirect examination he stated that Doris had told him that her Daddy wanted her to stay at home and that if she went with him she would have to slip off and go and that she was afraid that her father might get his gun and shoot him or something, and that he answered her "I think I am as quick on the trigger as he is". As regards the sisters of Doris Lamb, he said that in the same conversation Doris mentioned that her sisters might try to kill him, and he told her he would protect himself and that if they tried to kill him he would kill them.

In rebuttal, Doris Lamb testified that defendant said he was just as quick on the trigger as her Daddy and that he would get her sisters if he had to, but that he did not qualify his remarks with the statement that he would do those things if they were after him.

Both counsel for the state and defendant remarked in their brief that they doubted that the statements made by the defendant constitutes threats at all. If they did not constitute threats, evidence of the same was probably inadmissible but could hardly be termed as prejudicial error.

It is established law that threats of a general nature against a class may be shown, although not particularly directed against the deceased if the class of persons against which the threats are directed includes the deceased. Underhill's Criminal Evidence, 4th Ed., page 1124; Sears v. State, 27 Okla. Cr. 311, 227 P. 899; Smith v. State, 49 Okla. Cr. 339, 293 P. 569; McDaniel v. State, 8 Okla. Cr. 209, 127 P. 358; Gross v. State, 26 Okla. Cr. 105, 222 P. 275.

From all the facts and circumstances shown in the record, it is apparent that the defendant had a great attachment for Doris Lamb and was extremely jealous of anyone who in any way might attempt to interfere with his relationship to her.

We doubt that the alleged threats were so indefinite and broad enough to amount to a threat against a class. They were directed to the father and sisters of Doris Lamb, and were not of a general nature. It would appear that a specific threat made to a third person and not to a class of persons of which the deceased was a member would be inadmissible as evidence.

At the beginning of the case during the opening statement of counsel for the state, objection was interposed by counsel for the defendant to statements by the prosecutor concerning the above alleged threats by the defendant directed to members of the Lamb family. The court sustained the objection but stated that they might become material later. At the time the evidence of the alleged threats was introduced in rebuttal by the state, counsel for the defendant contended that he had excused a number of his character witnesses on the theory that as he understood the ruling of the court, the evidence of the alleged threats would not be admitted unless the defendant placed his character in issue.

There is nothing in the record to sustain this conclusion of counsel for the defendant as to the reasons of the court for sustaining the objection to the prosecutor's statement about the alleged threats in the opening statement to the jury. However, irrespective of that, when the objection was interposed to the admissibility of the threats in rebuttal on that particular ground, the court advised counsel for the defendant that the courtroom was filled

with people from Grandfield, and that if the particular witnesses were not there, he would recess court long enough to enable counsel for the defendant to secure their attendance. This specific ground of the objection to the admissibility of this evidence may not be sustained. However, we shall further discuss the admissibility of this evidence in connection with the contention of the counsel for defendant that the punishment assessed was excessive.

Complaint is made that the court erred in allowing the prosecutor to read an excerpt from the American Bar Journal to the jury on the duty of jurors. When the prosecutor in his closing argument started to read the questioned article, objection was interposed by counsel for defendant. The article was then shown to the court and after the court had read same, he directed the court reporter to place it in the record. This article reads:

"I am a juror.

"I am a seeker after truth.

"I must listen carefully and with concentration to all the evidence.

"I must heed and follow the instructions of the court.

"I must respectfully and attentively follow the arguments of the lawyers and dispassionately seeking to find and follow the silver thread of truth through their conflicting assertions.

"I must lay aside all bias and prejudice.

"I must be led by my intelligence and not by my emotions.

"I must respect the opinions of my fellow jurors, as they must respect mine, and in a spirit of tolerance and

understanding must endeavor to bring the deliberations of the whole jury to agreement upon a verdict;

"I must never assent to a verdict which violates the instructions of the Court or which finds as a fact that which, under the evidence and in my conscience, I believe to be untrue.

"In fine, I must apply the Golden Rule by putting myself impartially in the place of the plaintiff and of the defendant, remembering that although I am a juror today passing upon the rights of others, tomorrow I may be a litigant whose rights other jurors shall pass upon.

"My verdict must do justice, for what is just is 'true and righteous altogether'; and when my term of jury service is ended, I must leave it with my citizenship unsullied and my conscience clear."

Trial courts should be extremely careful in allowing counsel to read articles to a jury during their closing argument. Chiefly for the reason that it might constitute conveying to them matters de hors the record. We do not believe, however, that the contention of defendant that the reading of this article and its incorporation in the record constituted a further instruction containing an abstract statement of the law should be sustained.

Finally, it is contended that the punishment imposed upon the defendant is unreasonable and excessive. After a thorough consideration of all the facts, including the ruling of the court on the controverted legal questions hereinabove mentioned, we have come to the conclusion that this proposition is meritorious, and that the judgment and sentence assessed against the defendant should be reduced. In this connection, we feel that the assignments of error hereinabove discussed, and particularly the one with reference to the alleged misconduct of the court and the jury after the submission of the case concerning the question of the length of a calendar year in the

184

penitentiary, the question of the admissibility of the photographs of the deceased taken when he was 16 years of age, and the admission in rebuttal of threats made against a specific individual, considered with all the other facts, prompts us to give relief on this proposition of law. In doing so, we are giving the defendant the benefit of every doubt. We think, under the evidence, the jury was fully justified in fixing the punishment at 30 years imprisonment, but considering the age, the war record, the conceded evidence of emotional instability, the errors of law committed during the trial have forced us to conclude that justice would be served by modifying the sentence from a term of 30 years imprisonment in the State Penitentiary to a term of 20 years imprisonment in the State Penitentiary, and the judgment and sentence as thus modified is affirmed.

BAREFOOT and BRETT, JJ., concur.